*New-Haven,*
*June,*
*1819.*

THE STATE *against* DANFORTH.

*June 21.*

A battery, with intent to maim and kill, is, by the common law of this state, a high crime and misdemeanour, and may be prosecuted, as such, before the superior court.

Imprisonment for life, cannot be inflicted as the punishment of an offence at common ; and therefore, in a prosecution for such offence, the intervention of a grand jury is not required by the constitution of this state.

THIS was an information against *Stephen Danforth,* charging him with having made, on the 30th of *October,* 1818, with force and arms, an assault upon the body of *David Butler,* of *New-Haven,* keeper of *New-Haven* county gaol, who had entered the apartment of the gaol in which the prisoner was confined, for the purpose of examining the condition of the gaol ; " when and where the said *Stephen,* with intent to maim and kill the said *Butler,* with the like force and arms, did make a violent attack upon the body of the said *David,* and, with a large and heavy piece of oak hogshead heading, did then and there strike him, the said *David,* on the head, several dangerous blows, and with said piece of heading, cut the head of said *Butler,* in five places, to the scull, with intent him the said *Butler* to maim and kill, that he the said *Stephen* might thereby make his escape from said gaol ; and the said *Stephen* did then and there, with the weapon aforesaid, and with force and arms, him the said *Butler* knock down, and dangerously wound, so that his life was greatly endangered ; all which conduct of the said *Stephen,* as aforesaid, is a high crime and misdemeanour, against the peace," &c. The prisoner was tried, on this information, before the superior court, at *New-Haven, January* term, 1819, and was convicted. He then moved in arrest of judgment, for the causes hereafter specified ; and the court reserved the questions arising on such motion for the consideration and advice of all the Judges.

*Staples* and *R. I. Ingersoll,* in support of the motion, contended, 1. That the offence charged was an offence within the statute, *tit.* 125. *c.* 1. *s.* 1, 2., and could be prosecuted only in the manner prescribed by that statute. This is *a breach of the peace,* by the prisoner's *assaulting, beating or striking another person, aggravated by some notorious and high-handed violences.* If the *relation* between the party *smiting* and the

party *smitten*, the *time* and *place*, the *instrument* used, and the

*danger* produced, are ingredients of the offence, distinguishing
it from ordinary breaches of the peace : it is precisely such
an offence as the terms of the statute embrace.   Of this, the
county court alone has final jurisdiction.

2. That this offence could not be prosecuted before the su-
perior court, as a high crime and misdemeanour; especially,
since the adoption of the present constitution of the state.

3. That if it could be so prosecuted, then the punishment
might be imprisonment for life ; and no conviction could be
had, unless on a presentment or an indictment of a grand-jury.
*Const. art.* 1. *s.* 9.   There is no limitation to the common
law punishments of fine, imprisonment and pillory.   *Wren-
num's* case, *Pop.* 135.   If the superior court has cognizance
of the offence as a high crime and midemeanour, it may, un-
questionably, punish the offender by imprisonment for life ; and
such has been the practice in numerous instances.

*Baldwin* and *N. Smith*, contra, contended, 1. That a prose-
cution at common law for this offence, was not precluded, by
the statute relating to breaches of the peace.

2. That the offence charged, was a high crime and misde-
meanour, cognizable by the superior court.   *Stat. Conn. tit.*
42. *c.* 1. *s.* 24.   2 *Swift's Syst.* 365.   Our statute recognizes
the existence of high crimes and misdemeanours, and leaves
it to the common law to *define* and *punish* them.   The juris-
diction over this class of offences is expressly given to the su-
perior court, and has been exercised by that court, immemo-
rially, and uninterruptedly.

3. That a presentment or indictment by the grand-jury, was
unnecessary, because the offence is not punishable by death,
or imprisonment for life.   In the first place, the object of the
constitution was to *restrain* the infliction of death or impris-
onment for life, except through the intervention of a grand-
jury ; and not to *authorise* those punishments, on condition
that the court would call in a grand-jury.   Secondly, the com-
mon law punishments of fine, imprisonment and pillory, can-
not be extended indefinitely, but must be *limited* to a *certain
amount*, and a *certain duration*.   The common law will not
sanction a fine for as much money as the offender shall ac-
quire, during his life ; nor imprisonment, for such a length of
time as the offender shall live.

*New-Haven,*
June,
1819.

State
*v.*
Danforth.

HOSMER, Ch. J.    In this case three objections have been made to the court's rendering judgment against the prisoner.

The first is, that the prosecution is not founded on statute. It is contended, that there never existed a common law defining crimes; and if there had been one formerly, that the late constitution would have abolished it.  On this head of objection I am incapable of entertaining a doubt.    The principle contended for is perfectly novel.    The country from whence our ideas of jurisprudence have principally emanated, and our sister states, have a common law defining and punishing crimes;  and it is remarkable, that the written constitutions, adopted by the latter, have made no difference in their practice on this subject.    It is indispensibly necessary, that there should exist a common law, on the broad principles of public convenience and necessity, defining crimes, and prescribing adequate punishments.    To determine, by statute, every offence, and direct the punishment which shall be inflicted, has not, so far as I know, ever been attempted, and would be nearly impracticable.    The community must, at least, be left exposed to injuries the most atrocious ; and the evils resulting would be much greater, than any reasonable mind will anticipate, from the exercise of a sound discretion, in the application of principles and analogies, which the common law supplies.    Instead, however, of theory, we have well established rules to guide us on this interesting subject.   A series of precedents, from a period beyond the memory of man, have settled the question now raised;  during which period, offences in this state, have been defined and punished, at common law. If we have any established law, this is immoveably fixed on the basis of principle, often recognized, and decisions uniformly rendered.    The effect of the constitution on this point has been so entirely mistaken, that I am at a loss to conceive on what possible ground, it can be brought to bear on the question.    It must have been supposed by the objector, that the constitution implies an abolition of every rule of action preceding it, and the commencing life anew, without the benefit of a single practical lesson of wisdom derived from our predecessors, or even from ourselves.

In reply to a supposition so extravagant, I have already opposed the practice of those of our sister states, who have adopted written constitutions.    It may likewise be effectually re-

sisted, by an explicit provision of the constitution itself. (a) "The validity of all bonds, debts, contracts, as well of individuals as of bodies corporate, or the state, of all suits, actions, or rights of action, either in law or equity, shall continue as if no change had taken place." That this clause was intended, *ex abundanti cautela*, to rescue the common law, and suits founded upon it, from abolition, is not only apparent from its expression, but from the preceding paragragh, which has exercised the same caution in respect of the statutes.

*New-Haven*
June,
1819.

State
*v.*
Danforth.

A second objection has been presented, that the statute against breaking the peace has repealed the common law on the subject before us. This act prescribes a punishment and fine for an assault and battery; and if the offence be aggravated by some notorious and high-handed crimes, a binding over of the offender to the next county court. The offence here spoken of, intends nothing beyond battery, attended with unusual damage. But the aggravation attending the crime now prosecuted, refers to the *nature* of the offence, and not merely to the accidental consequences. It was a battery *with intent to maim and kill*; and that distinguishes it from a beating, where there was no such intention. Trespass, assault and battery, trespass with an intent to kill, and murder, are each more aggravated than the other; and as they rise on the scale of aggravation, they constitute distinct offences: Murder is nothing but an aggravated trespass. Crimes are defined from their nature and consequences. Now, I cannot doubt, that the murderous intention and barbarous cruelty of the trespass complained of, is a different offence from any ordinary battery. This is in conformity with the law on this subject, universally understood, and sanctioned by numerous decisions.

The last objection made, is, that the offender may be confined in *new-gate* for life, and by the constitution can only be prosecuted through the medium of a grand-jury. This objection is founded on the supposition, that at common law, it is competent for the court to inflict fine and imprisonment, without limitation. No precedent has been cited in proof of this principle, except the punishment for a libel published against the Lord Chancellor *Bacon*; and the circumstances attending the above decision would take from it the force of authority, if

(a) *Art.* 10. *s.* 3.

*New-Haven,*
*June,*
*1819.*

State
*v.*
Danforth.

the extravagance of the punishment had not clearly referred it to the temper of the times. *Wrennum's* case, *Pop.* 135.

The common law can never require a fine to the extent of an offender's goods and chattels, or sentence of imprisonment for life. The punishment is both uncertain, and unnecessary. It is no more difficult to limit the imprisonment of an atrocious offender to an adequate number of years, than to prescribe a limited punishment for minor offences. And when there exists no firmly established practice, and public necessity or convenience does not imperiously demand the principle contended for, it cannot be the common law, as it wants the main ingredient on which that law is founded. Indefinite punishments are fraught with danger, and ought not to be admitted, unless the written law should authorize them. It is true, that there have been instances of persons sentenced to *newgate* for life, where the statutes did not give the authority; but those decisions have not been so numerous, nor do they appear to have been so thoroughly considered and discussed, as to possess the force of precedent.

I would advise the superior court to render judgment upon the verdict against *Danforth.*

CHAPMAN, BRAINARD and BRISTOL, Js. were of the same opinion.

PETERS, J. Upon an information, filed by the state's attorney, for an assault and battery, with an intent to kill, the defendant has been convicted, and now moves in arrest of judgment ; because,

1. This is an offence by statute, whereof the county court has jurisdiction ; or,

2. It is an offence at common law, whereof no court has jurisdiction; or,

3. It is punishable by imprisonment for life, and by indictment only.

1. By statute, " whoever shall disturb, or break the peace, by tumultuous and offensive carriages, threatening, traducing, quarrelling, challenging, assaulting, beating or striking any other person, such person or persons, so offending, shall be liable to pay to the party hurt or stricken, just damages ; and also shall pay such fine, as, on consideration of the party smiting, or being smitten, and with what instrument, danger,

more or less, time, place, and provocation, shall be judged just and reasonable, according to the merit of the offence, as the judges shall determine. And if such offence be *aggravated* by some *notorious* and *high-handed violences*, the offender or offenders shall be bound over to the county court for such offence." (*a*) This seems to have been an adoption of so much of the common law, first by our ancestors at *Plymouth*, (*b*) and afterwards, by our legislature in 1672, (*c*) and has been continued in force, without alteration, except the direction relative to binding over to the county court, added in 1750 ; (*d*) as it contains the common law description of assault and battery, even with intent to murder, which, not being felony, (*e*) is punishable by fine, imprisonment, and pillory, and " not extending to life, limb or banishment," is cognizable by the county court. (*f*) Nevertheless, by a new version of the common law, this statute offence has been classed with burglary, robbery, and other atrocious crimes and felonies ; and the discretionary fine of the statute, and the fine, imprisonment and pillory of the common law, by modern adjudications, (*g*) have been converted into confinement to hard labour, and occasional whipping, in " shackles and fetters," in a subterraneous dungeon, (*h*) limited only by the *discretion* of the court, and the *life* of the offender.

2. Have our courts jurisdiction of offences at common law ? Or have they power to define crimes, and prescribe punishments ? This power has been exercised time immemorial, in *England*, by courts originating in the common law ; (*i*) and had this question arisen under the late government, I should have considered myself bound by repeated adjudications of the superior court, and two at least of this court, (*j*) though the reasons of those decisions were never satisfactory to me. But I now feel myself at liberty to say, they are not law, and to add, with all due deference, they never were law, though sanctioned by an *Ellsworth* and a *Parsons*.

It has been said, by the same high authority, " that our an-

---

(*a*) *Tit.* 125. *c.* 1. *s.* 1, 2.      (*b*) *Laws of Plymouth*, p. 8.      (*c*) Revision of 1672, p. 56.      (*d*) Revision of 1750, p. 185.      (*e*) *Commonwealth* v. *Barlow*, 4 *Mass. Rep.* 439. *Bacon's* case, 1 *Lev.* 146. 4 *Black. Comm.* 216. (*f*) *Stat. tit.* 42. *c.* 1. *s.* 42.   (*g*) Newgate was established in *October*, 1773. (*h*) *Stat. tit.* 118. *c.* 1. *s.* 1. 4.      (*i*) 4 *Inst.* 71. *Rex* v. *Curl*, 2 *Stra.* 789. (*j*) *State* v. *Steele*, cited 2 *Root*, 62. *State* v. *Wilson, Ibid. Knowles*' case, 3 *Day* 103.

New-Haven,
June,
1819.

State
v.
Danforth.

cestors claimed the common law as their birthright, and brought it with them as amended by *English* statutes, when they came into this new world, except such parts as were judged inapplicable to their new condition ; which, with a few subsequent *English* statutes, *adopted* by our courts, became our common law, and remain the same as before the revolution." (*k*) Others of equal authority, consider "the common law in force in every state, so far as it is applicable to their circumstances, as it existed in *England*, unaltered by statute, at the time of the first settlement of the country." (*l*) I have sought in vain, in the history and legislative acts of our ancestors, for a confirmation of this doctrine. But it is apparent to my understanding, that their sole object was to found a pure government in church and commonwealth, "surely bottomed on the word of God ;" (*m*) and that they brought with them no more affection for the common law, than the canon law, the court of star-chamber, and high commission, from which they fled with horror and detestation ! (*n*)

Accordingly, we find, in the first page of their statutes, a solemn provision against all indefinite laws, and discretionary punishments, which "remained for substance the same," until the adoption of the constitution. "No man's life shall be taken away ; no man's honour and good name shall be stained ; no man's person shall be arrested, restrained, banished, dismembered, nor any ways punished ; no man shall be deprived of his wife or children ; no man's goods or estate shall be taken away from him, nor any ways endamaged ; under colour of law, or countenance of authority, unless it be by virtue or equity of some express law, established by the general court, and sufficiently published, or in case of the defect of a law in any particular case, by some clear and plain rule of the word of God."(*o*) Many other of our ancient statutes furnish incontrovertible evidence, that our ancestors did not consider the common law in force here. In their definitions of crimes, they did not adopt one of the common law ; and every section of their "capital laws," except arson and treason against their own commonwealth, is accompanied with a

(*k*) *Commonwealth* v. *Knowlton,* 2 *Mass. Rep.* 530, 534. *United States* v. *Isaac Williams,* 2 *Cranch* 82. *n.* (*l*) Per *Iredell,* J. in *Chisholm* v. *Georgia,* 2 *Dall.* 435. (*m*) 1 *Trumb. Hist. Conn.* 91, 95. (*n*) 1 *Hutch. Hist. Mass.* 393. *Neal,* passim. (*o*) *Revision of* 1672. *p.* 1.—1702. *p.* 1.—1750. *p.* 1. —1784. *p.* 1. 265.—1795. *p.* 1.—*Laws of Massachusetts,* edit. 1972.

list of the texts of scripture on which it is bottomed.(*p*) In 1652, the legislature of *Massachusetts* expressly say, they had no law for the punishment of ·a crime capital at common law, (*q*) and by statute 3 *Edw.* 1.—" Whereas some dwelling houses, &c. within this jurisdiction have been set on fire: The court, taking into consideration the danger of such wicked practice, and there being *no law* yet provided for the punishment of so heinous a crime,—do therefore order, and be it enacted &c. That such person or persons be put to death," &c.(*r*)  " In civil actions," says an historian,(*s*) who was himself a learned judge, " equity, according to the circumstances of the case, seems to have been their rule of determining:— the judges had recourse to no other authorities than the reason and understanding which God had given them.  In punishing offences, they professed to be governed by the judicial law of *Moses*.  In that branch of law, more especially, which is distinguished by the name of *crown law*, they professed to have no regard to the rules of the common law of *England*.  They intended to follow *Moses'* plan, but no further than it was of a moral nature."

In this state, our courts seem not to have considered the common law in force *proprio vigoro*, but the judiciary as auxiliary to the legislature, extending the written law, and supplying its defects.(*t*)   " Thus," says our learned commentator,(*u*) " courts have *assumed* the discretionary power of punishing as misdemeanours those acts they deem criminal, though warranted by no express law ;" or, in the language of this court, " public shows or exhibitions (and, of course, acts,) which outrage decency, shock humanity, or are contrary to good morals, are punishable at common law."(*v*)  By statute, (*w*) effecting or attempting an escape from new-gate, is punishable by imprisonment therein : our courts have extended it to other prisons.(*x*)  By statute,(*y*) attempting to commit a rape, is subject to the same punishment : our courts have extended it to administering potions, without effect or injury, " to the intent to provoke unlawful love."(*z*)  By the civil law, (*a*)

---

(*p*) Revisions of 1672, and 1702.   (*q*) 3 *Inst.* 66.    (*r*) *Laws of Massachusetts*, edit. 1672, *p.* 51.      (*s*) 1 *Hutch. Hist. Mass.* 384. 387.   (*t*) *Willford* & al. v. *Grant, Kirby* 117.     (*u*) 2 *Swift's Syst.* 365.     (*v*) *Knowles'* case, 3 *Day*, 103. 108.    (*w*) *Tit.* 66. *c.* 3. *s.* 8.      (*x*) *Thomas'* case, *Windham*, 1809.    (*y*) *Tit.* 66. *c.* 3. *s.* 7.   (*z*) *Steele's* case, cited 2 *Root*, 62.     (*a*) à *Domat*, 646.

*New-Haven,*
*June,*
*1819.*

State
*v.*
Danforth.

assuming a false name or character is punishable with death ; not at all, by statute or common law : our courts doom such offenders to new-gate.(*b*)

At what period of our juridical history, our courts assumed this prerogative of the *aula regis*, does not appear ; but it does appear, that in 1743, the superior court suspended judgment against a malefactor,(*c*) convicted of an atrocious mayhem, which was felony by common law,(*d*) because no punishment was prescribed by statute, and petitioned the legislature for direction ; who thereupon resolved " that the judges cause such punishment to be inflicted, as to justice appertains, according to their best skill and judgment."(*e*)    The court adopted the *lex talionis*, and awarded " *membrum pro membro.*"(*f*)

It has been said, that the statute giving jurisdiction of " high crimes and misdemeanours," is a grant of common law powers ; but it is a maxim in jurisprudence, that " penal laws are to be construed strictly."(*g*)    Thus, a statute punishing with death those who stole *horses*, was holden not to extend to the stealing of *one*.    And another making it " felony to steal sheep or other cattle," was construed to extend to sheep only.    But the common law may be extended to all acts " *coutra bonos mores*," which vary with climate, and the education and habits of men.    Thus, in some countries, to *kill* or *enslave* an *Indian*, a *Negro*, or a *Christian*, is an atrocious crime ; in others, a mere *bagatelle !*

It is said, the exercise of this power is *necessary*.    If so, statutes are unnecessary.    If the judiciary is competent to *adopt* statutes, define crimes, and prescribe punishments, a legislature is useless !    Whatever may have been the effect of constitutions in other states upon the common law, many of which have adopted it,(*h*) it was certainly the object of the projectors(*i*) of our constitution, to *separate, define* and *limit* the constituent powers of government ; which, I think, the framers of that instrument have effected.    It declares, " that the powers of government shall be divided into three distinct depart-

(*b*) *Parker's* case, *Tolland, December,* 1805.      (*c*) *Rex* v. *Barney, Hartford, September,* 1743.      (*d*) 3 *Inst.* 162.    *Bract.* lib. 3. 144.    " *Si quis alterius virilia absciderit, sequitur pœna capitalis.*"      (*e*) *October Session,* 1743. (*f*) *Special Session, November,* 1743.      (*g*) 1 *Black.* Comm. 88.    (*h*) See the constitutions of *New-Hampshire, Massachusetts, New-York, New-Jersey, Maryland,* &c.      (*i*) Vide Address of *New-Haven* Convention, 1804.

ments, and each of them confided to a separate magistracy :" " That the judicial power of the state shall be vested in a supreme court of errors, a superior court, &c. the *powers* and jurisdiction of which courts shall be *defined* by law."(*j*) Where is the law defining the power we are now called upon to exercise ? Is it the common law ? But this court and its jurisdiction are created by statute ; and we are informed by the highest judicial authority in the nation,(*k*) " that courts which originate in the common law possess a jurisdiction, which must be regulated by the common law, until some statute shall change their established principles ; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction." To this doctrine I subscribe, and wish I could, in the language of Chief Justice *Marshall*, declare, " that this court disclaims all jurisdiction not given by the constitution and laws of this state."

In conformity with this principle, the same high tribunal has more than once decided, that the courts of the *United States* have not jurisdiction of crimes at common law. " Certain implied powers must necessarily result to our courts of justice from the nature of their institution. But jurisdiction of crimes against the state is not among those powers. To fine for contempt—imprison for contumacy—enforce the observance of order, &c. are powers, which cannot be dispensed with, in a court, because they are necessary to the exercise of all others : and so far, no doubt, our courts possess powers not immediately derived from statute ; but all exercise of criminal jurisdiction, in common law cases, we are of opinion is not within their implied powers." " The legislative authority must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offence."(*l*)

To come nearer home : " Courts of law," says an eminent jurist, (*m*) in discussing this question, unshackled by authorities, " ought always to be under the guide and restraint of strait rule, and precise definition : they ought never to be allowed to depart from the well known boundaries of express law, into the wide field of discretion. If they are accus-

(*j*) *Articles*, 2, 5.    (*k*) Ex parte *Bollman and Swartout*, 4 *Cranch*, 75, 93. (*l*) *The United States* v. *Hudson* & *Goodwin*, 7 *Cranch*, 32, 34. See also *The United States* v. *Coolidge* & al., 1 *Wheat.* 415.    (*m*) Ch. J. *Swift*, 2 *Swift's Syst.* 366.

tomed to the exercise of such a power, in one instance, there is reason to apprehend the extension of it to others ; and that the law, instead of being founded on plain and fixed principles, will be as uncertain as the whim and caprice of the court." " No man can feel safe and quiet, when he knows that courts have a power over him, the extent of which is so undefined, and the consequence so uncertain, that he cannot know the one, or calculate upon the other. But when it is considered, that this power is unnecessary for the public welfare, it is the more extraordinary, that it has ever been exercised." I conclude this topic in the words of a greater jurist.(n) " The discretion of a judge is the law of tyrants ; it is always unknown ; it is different in different men ; it is casual, and depends upon constitution, temper and passion. In the best, it is oftentimes caprice ; and in the worst, it is every vice, folly, and passion to which human nature is liable !"

3. Is this offence punishable by imprisonment for life ? If so, it must be *by indictment :* for by the constitution, " no person shall be holden to answer for any crime, the punishment of which may be death or imprisonment for life, unless on presentment or indictment of a grand jury."(o)  And we have the same evidence that it is punishable by imprisonment for life, as we have, that it is punishable at all—solemn and repeated adjudications.

But it is said, that the common law can never require a sentence of imprisonment for life :—that *Wrennum's* case was in the *Star-Chamber.* Be it remembered, that *that* court was composed of the oracles of the common law ; and that its decisions, before it was perverted to political purposes, are justly holden in the highest estimation ; and they are now cited as authorities in our courts ; of which we " read plentifully" in *The Reports, Croke, Popham, Hobart,* &c. e. g. *Twyne's* case.

" It is the most honourable court," saith Lord *Coke,* " (our parliament excepted,) in the christian world." 3 *Inst.* 65. " Seeing it is an ancient court, the precedents of the court are to be followed ; and the rather, for that the court consisteth of such learned and honourable judges." 3 *Inst.* 66. In *Rex* v *Johnson, Comb.* 36. it is said, " the authority of this court was, and is, in the *King's Bench,*" who have often exercised it in the same manner.

(n) Lord *Camden.* See. 1 *Day,* 81. *n.*    (o) *Art.* 1. *s.* 9.

" If any man," says Ld. *Coke*, " in *Westminster-Hall*, or in any other place, in the presence of the court, draw a weapon upon a judge, or strike a juror, or any other person, he shall lose his right hand, forfeit his goods and land, and his body to *perpetual imprisonment.*" 3 *Inst.* 142. He also informs us, that in the reign of *Edward* 1., *William de Brewse*, for reviling a judgment of *Roger de Hegham*, and other justices, " *committitur turri London, ibidem moratur' ad voluntatem regis.*" 3 *Inst.* 142. In the reign of *Edward* 4. *John Davis* struck one in the face, with his fist, in the great hall of *Westminster*, all the king's courts sitting there, and threatened to hang him, if he should give evidence against a felon then to be arraigned in *Banco Regis ;* for which act he was indicted ; and for judgment, had *perpetual imprisonment during life*, forfeited all his lands, &c.(*p*) In the reign of *Charles* 1., Sir *William Waller*, for assaulting and beating Sir *Thomas Reignolds*, near the great hall, all the justices sitting, was *imprisoned during the king's pleasure*, &c.(*q*) And for accusing Justice *Hutton* of high treason, in presence of the court, *Thomas Harrison* received the same punishment. (*r*) In the reign of *Charles* 2., *Thomas Brewster* and others were indicted, at the common law, as for a great misdemeanour, for printing and publishing the speeches and prayers of *Harrison, Cook, Hugh Peters*, and others, condemned for the murder of *Charles* 1., and were sentenced to the pillory, and to remain *in prison during the king's pleasure.* (*s*) " However," says Sergeant *Hawkins*, on a review of the cases on this subject, " it is certain, that by the common law, which continues to this day, striking in *Westminster-Hall*, where the king is present only by his judges, is more penal than in another place, in his actual presence ; for the latter is not punished with loss of hand, land, &c., unless some blood be drawn. But if one draw his sword on a judge, in the presence of the court, whether he strike or not ; or strike a juror, or any other, with, or without a weapon ; he shall lose his hand, his goods, and the profits of his lands during life, and suffer *perpetual imprisonment.*"(*t*)

These authorities seem to demonstrate, that the common law *sometimes* requires imprisonment for life, or during the

(*p*) *Davis'* case. *Dyer* 188. *b.* See also Sir *Thomas Savill's* case, *Pop.* 207.
(*q*) Sir *William Waller's* case, *Cro. Car.* 378. (*r*) *Harrison's* case, *Cro. Car.* 503. (*s*) *Brewster* and *Brooke's* case, *Kelyng* 23. See also 2 *St. Tri.* 528, 533, 545. (*t*) 1 *Hawk. P. C.* 88.

*New-Haven,*
*June,*
*1819.*

State
*v.*
Danforth.

king's pleasure, " which amount to the same thing,"(u) and to rescue *Wrennum's* case from the odium of the *Star-Chamber,* in its latter days.

It is admitted, that persons have been sentenced to new-gate for life, without the authority of statute.   But these de-cisions are said not to have been so numerous, nor so tho-roughly considered, as to have the force of precedent.   How *numerous* these decisions have been, or how often a point must be decided *to have the force of precedent,* I know not.   I hope there are enough to attract the notice of those, who can relieve the wretched victims.   Five cases only, decided in less than seventeen years, have come to my knowledge ;(x)   and I cannot, I will not, think so irreverently of my venerable and learned predecessors, as to imagine, that they have immured their fellow citizens in a dungeon for life, without due conside-ration.   No, they understood the common law ; and it was their wish to stand *super antiquas vias,* and tread in the foot-steps of their *English* predecessors, where it is my pride and my pleasure to follow them, when unrestrained by a law par-amount.

As I am bound to give my own opinion, and my own rea-sons, I make no apology for dissenting from those whose opin-ions I so highly respect.   If I am in an error, it will, fortunate-ly, be harmless.   If these remarks deserve any consideration, they may induce my brethren of the bench, and of the bar, to review a decision, which I cannot but consider as subversive of *a government of laws.*

Judgment to be entered on the verdict.

(*u*) 4 *Bla. Comm.* 118.       (*x*) *John Adams, New-Haven, August,* 1801. *William Riley, New-Haven, January,* 1807.   *Josiah Smith, Hartford, Novem-ber,* 1808.   *Reuben Adams, jun. Windham, January,* 1810.   *Prince Mortimer, Middlesex, December,* 1810.