SKARDA *v.* STATE.

Opinion delivered April 19, 1915.

1. CRIMINAL LAW—INSOLVENT BANK—ACCEPTING DEPOSIT.—An indictment charged that defendant as cashier of a certain bank, did "unlawfully, feloniously * * * accept and receive on deposit in said bank * * * fifty-five dollars, gold, silver and paper money * * *," knowing the bank to be insolvent at the time; *held*, the indictment was good and stated the commission of a public offense.*

2. CRIMINAL LAW—INSOLVENT BANK—RECEIVING DEPOSITS—RESPONSIBILITY OF OFFICERS.—An indictment charging that defendant was cashier of a bank, and that he accepted deposits therein, knowing the bank to be insolvent, held sufficient to properly state a charge against defendant under Kirby's Digest, § 1814.

3. CRIMINAL LAW—INSOLVENT BANK—RECEIVING DEPOSITS—OFFICER.—Where S. had been cashier of a bank and continued to discharge the duties of that office, although superseded by another officer in the bank, he can not escape criminal liability under an indictment charging him with having received deposits, knowing the bank to be insolvent, and charging him with being the cashier thereof, on the ground that he was not cashier of the bank.

4. INSOLVENT BANKS—RECEIVING DEPOSITS—CRIMINAL RESPONSIBILITY OF OFFICER—EVIDENCE.—To sustain the conviction of an officer of the crime of receiving deposits knowing the bank to be at the time insolvent, the State must show both that the bank was insolvent, and that the officer indicted had knowledge of that fact; and in order to do so, the State may show the nature and value of the bank's assets, the character and extent of its liabilities, and the State must show the receipt of a deposit after knowledge of insolvency. This latter fact may be proved by circumstances which impute to the officer a knowledge of the bank's insolvency.

5. EVIDENCE—INSOLVENT BANK—RECEIVING DEPOSITS—KNOWLEDGE OF OFFICER.—In the prosecution of an officer of a bank for the crime of receiving deposits, knowing the bank to be insolvent, a complaint at the instance of appellant's successor as cashier of the defunct bank, in which a receivership was asked, and from which the insolvency of the bank was inferrable, is incompetent as evidence, since the appellant was not responsible for the recitals of fact therein, and the same was incompetent as hearsaw.

6. CRIMINAL LAW—INSOLVENT BANK—DEPOSIT.—Evidence held to show that the defendant received a deposit in the bank, and that the transaction had, constituted the making and receiving of a deposit.

---

*See Kirby's Digest, § 1814.

7.  CRIMINAL LAW—INSOLVENT BANK—RECEIVING DEPOSITS—INDICTMENT
    AND PROOF—VARIANCE.—J. presented a check for $70 at a bank and
    received $15 in cash.  The balance being credited to his account.
    The bank was insolvent and the officer receiving the deposit was
    indicted for receiving "fifty-five dollars in gold, silver and paper
    money etc.," knowing the bank to be insolvent.  *Held*, there was
    no variance between the indictment and the proof.

8.  INSOLVENT BANKS—RECEIVING DEPOSITS—INSOLVENCY.—In a prosecu-
    tion for the crime of receiving deposits knowing the bank to be
    insolvent, the evidence held sufficient to show the bank to be
    insolvent, and that defendant was aware of that fact, when he
    accepted the deposit.

9.  BANKS—INSOLVENCY.—A bank is insolvent, when, under ordinary
    and usual circumstances, it is unable, by putting up its collateral
    and credit, to get the money to pay its debts or depositors, as
    the same become due or payment is demanded in the ordinary
    course of business.

10. BANKS—INSOLVENCY—CAPITAL STOCK.—Capital stock and surplus
    are not to be considered as a liability in determining a bank's sol-
    vency.  If a bank by using its capital and surplus, or both can
    promptly pay its depositors and other debts, it is not insolvent.

11. CRIMINAL LAW—INSOLVENT BANK—RECEIVING DEPOSITS—SOLVENCY—
    EVIDENCE.—S. was indicted as an officer of a bank, for the crime of
    receiving a deposit, knowing the bank to be insolvent.  *Held*, it
    was improper to refuse to permit the receiver, who was thoroughly
    conversant with the affairs of the bank, to answer questions as to
    her belief as to the probability of collecting certain obligations
    due the bank.

Appeal from Prairie Circuit Court, Southern Dis-
trict; *Eugene Lankford*, Judge; reversed.

*J. G. & C. B. Thweatt* and *Manning, Emerson & Mor-
ris*, for appellant.

1.  The indictment does not charge any offense under
Kirby's Dig., § 1814.  It is fatally defective.  Penal stat-
utes are strictly construed and the language of the indict-
ments must state facts within the terms of the statute.  90
Ark. 1; 49 So. 615; 107 N. W. 927; 32 Atl. 617; 57 N. E.
109; 58 Ark. 35-38; 50 N. E. 106, etc.

2.  There is variance between the indictment and
proof.  91 Ark. 1; 50 N. E. 106; 13 Ark. 62; 29 *Id*. 299;
34 *Id*. 160; 96 *Id*. 63; 70 *Id*. 144; 73 *Id*. 169; 55 *Id*. 242-389;
62 *Id*. 516; 102 *Id*. 513; 60 *Id*. 141-161; 71 *Id*. 415; 107 N.
E. 927.

3. The court admitted incompetent testimony and refused competent testimony offered. 42 Mo. 242; 74 S. W. 846; 48 *Id.* 72-77; 98 N. W. 190; 91 Ark. 555-9; 39 *Id.* 278; 52 *Id.* 303-9.

4. The court erred in giving and modifying instructions and in refusing instructions requested. 38 Pac. 296-9.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The indictment was sufficient to bring appellant within the terms of the statute. 102 Ark. 513-517; 99 *Id.* 547; 90 *Id.* 596; 102 *Id.* 651; 64 So. 740; 20 L. R. A. (N. S.) 444-449; 35 L. R. A. 176-182.

2. There is no variance between the indictment and proof. 37 L. R. A. 132; 57 A. S. R. 339-492; 20 L. R. A. (N. S.) 444-448; 115 S. W. 1106-1122.

3. No incompetent testimony was admitted, but, if so, the error was cured by instruction No. 11, as modified. 118 Pac. 9; *Davis* v. *State,* 115 Ark. 566.

4. There is no error in the instructions. 57 A. S. R. 339-402; 92 N. W. 420; 38 Pac. 298; 54 S. W. 226; 119 Pac. 30; 20 L. R. A. (N. S.) 444. The cases above state the two rules or methods used by the courts to determine ''insolvency'' of a bank. Instruction 5 correctly states the law, cases *supra,* and even if No. 4 improperly defined ''debts of the bank,'' in view of No. 5 stating the test properly no prejudice resulted.

SMITH, J. Appellant was convicted for accepting money for deposit in a bank of which he was the cashier when he knew the bank was insolvent.

The prosecution was had under section 1814 of Kirby's Digest, which reads as follows:

''No bank shall accept or receive on deposit, with or without interest, any money, bank bills or notes, or United States treasury notes, gold or silver certificates, or currency, or other notes, bills or drafts, circulating as money or currency, when such bank is insolvent; and any officer, director, cashier, manager, member, party or managing

party of any bank who shall knowingly violate the provisions of this section, * * * shall be guilty of a felony. * * *".

The indictment alleged that on the 17th day of March, 1913, (appellant), then and there being the cashier of the Bluff City Bank, of DeValls Bluff, Ark., said bank being a corporation organized and doing a banking business under the laws of the State of Arkansas, did unlawfully, wilfully, knowingly and feloniously accept and receive on deposit in said bank, the Bluff City Bank, of and from Joe Janet, fifty-five dollars, gold, silver and paper money, said money being then and there accepted and received on deposit in said bank by said defendant, Joe Skarda, the said Bluff City Bank, being then and there insolvent, and the said Joe Skarda being then and there the cashier of said bank, well knowing at the time he so accepted and received on deposit said money as aforesaid that said Bluff City Bank was then and there insolvent. * * *"

The record is a voluminous one, and many questions are discussed in the appellant's brief, but all of the questions which it will be necessary to consider may be arranged under the following topics:

1. Does the indictment charge an offense?

2. Is there a variance between the indictment and the proof?

3. Was error committed in the admission or rejection of testimony?

4. Did the court err in giving or refusing instructions?

(1) It is first insisted that the indictment does not charge the commission of a public offense, in that it does not allege that the money deposited circulated in this jurisdiction as money, and fails to allege that the money so deposited was of any value.

In reply to this it may be said that the indictment does allege the deposit of $55 gold, silver and paper money; and such deposit is within the protection of the statute if it is of any value. Fifty-five dollars of gold, silver and paper money, whether current in this jurisdic-

tion or not, necessarily have some value. *Morris* v. *State,* 102 Ark. 513. And if an officer of an insolvent bank knowingly receives such money on deposit he can not defend by showing that the money so received was not current in this country. Nearly all of the States now have laws more or less similar to our statute on this subject, and the courts of all the States, in construing their respective statutes, say they are designed for the protection of depositors, and our own court has said that a special deposit, as well as a general one, is within the protection of this statute. *State* v. *Smith,* 91 Ark. 1.

(2) It is also urged that the indictment is defective in that it fails to allege that appellant received the money as cashier. Support for this position is found in the case of *State* v. *Winstandley,* 57 N. E. 109. In that case an indictment very similar to the one in the present case was held insufficient for the reason stated. But a contrary view has already been taken by this court in the cases of *Morris* v. *State, supra,* and *Davey* v. *State,* 99 Ark. 547. In the *Morris* case, *supra,* it was said:

"A corporation can only act through its agents. The allegations of the indictment were sufficient to charge that the bank had received and accepted the deposit while insolvent, and that the appellant, who was president of the bank, and who acted for it in receiving and accepting the money on deposit, knew at the time the bank was insolvent, and therefore violated the provisions of the statute in thus accepting the money on deposit.

"It was unnecessary for the indictment to charge in specific terms that appellant was an officer of the bank. He was designated in the indictment as president of the bank, which was sufficient to show that he was an officer of the bank. The allegations of the indictment were amply sufficient to show that the bank, through its duly constituted agent, accepted and received the deposit, being at the time insolvent, and that the appellant, being at the time president, and therefore an officer of the bank, and knowing of its insolvency, accepted and received the de-

posit. Everything necessary to constitute the offense charged was stated.''

The indictment here was substantially in the form of the indictment which was approved in the two cases last cited.

This question was recently before the Supreme Court of the State of Mississippi, and that court refused to follow the Indiana case. *State* v. *Taylor,* 64 So. 740.

(3) Appellant also insists that the proof fails to show that he was the cashier of the bank at the time the alleged deposit was made, and he says that, upon the contrary, the proof shows that he was not the cashier at that time, and that there was therefore a failure of proof to sustain a material allegation of the indictment. The proof on the part of the defense was that appellant had been cashier of the bank for a number of years, but had been superseded by his assistant. Yet there was proof from which the jury no doubt found, and which was sufficient to sustain the finding, that appellant continued to remain in the bank and to discharge, ostensibly, his customary duties there. This change in the cashier appears to have been made at the direction of the managing officer of one of the defunct bank's correspondents, and while after the change was made, there was a limitation upon the authority which appellant had previously exercised, at least, so far as the defunct bank's dealings with this correspondent bank were concerned, yet, as has been said, appellant continued in the performance of his former duties.

Upon this question the court gave the following instruction:

''You are instructed that one who has been elected and made cashier of a bank and remains in the bank and holds himself out to the public as cashier of the bank and is held out by the bank as its cashier for the purpose of receiving deposits is under the law under which this defendant is being tried the cashier of the bank.''

We think no error was committed in giving this instruction.

It is insisted that the proof failed to show the bank was insolvent at the time it closed its doors; and the contention is also made that incompetent evidence was admitted upon the question of the bank's insolvency and of appellant's knowledge of that fact.

(4) The evidence is very voluminous and conflicting, and we shall not undertake to state the evidence in regard to the various transactions relating to these questions. We shall merely state the general principles which should govern trial courts upon such issues. To sustain the conviction the State must not only show that the bank is insolvent, but must further show that the officer receiving the deposit has knowledge of that fact. It would be very unusual if these facts could be established by proof of a single transaction. It is almost certain that these facts can be established only by an examination into the affairs generally of the bank. It is, therefore, competent and proper for the State to show the nature and value of the bank's assets, and likewise the character and extent of the bank's liabilities; and it is further competent and necessary for the State's proof to show the receipt of a deposit after knowledge of insolvency. The proof of this knowledge is frequently an inference to be drawn from circumstances, and the official charged with this crime can not complain of the proof of circumstances which impute to him knowledge of the bank's insolvency, even though such proof tends to show the commission of this offense by the receipt of deposits other than those alleged in the indictment. *State* v. *Welty,* 118 Pac. 9, and cases there cited. But the proof should be limited to the purposes stated, and the State should not be permitted to prove any facts or circumstances from which the guilt of the accused might be inferred, unless such facts and circumstances also tend to show the bank's insolvency and the officer's knowledge of that fact.

(5) The State was permitted to offer in evidence, over appellant's objection, the complaint filed at the instance of appellant's successor as the cashier of the defunct bank, in which the appointment of a receiver was

asked. From this complaint it was fairly inferable that the bank was not only insolvent at the time it closed its doors, but had been for some time prior thereto.

We think the court erred in the admission of this complaint in evidence. Appellant was not responsible for the recitals of fact contained in this complaint, and it was incompetent as hearsay evidence.

(6) It is also urged that the evidence does not show that Janet became a depositor of the defunct bank. But this question was submitted to the jury under proper instructions, and we think the proof is sufficient to support a finding that he was in fact a depositor. Appellant testified that Janet presented at the bank one morning, before it had opened for business, a check for the sum of $70, and that Janet was told at the time that the vault was not open and there was not enough money out of the vault to cash the check, but that there happened to be $15 in a drawer, which was given him, and he was given a deposit slip to show that $55 was still due him, and was told to return for the remainder when the bank opened. Such a transaction does not constitute a deposit within the meaning of the law; but this was not the transaction had according to the proof upon the part of the State. That proof was to the effect that Janet took a check drawn on the defunct bank by one of its depositors for the sum of $70, and demanded, and was paid, $15, and received from the bank the usual deposit slip showing the deposit to his credit of the sum of $55, this fact being shown by the receipt of the check, less the credit.

It is next earnestly insisted that if the State's proof is sufficient to establish the fact that a deposit was made by Janet, it further shows a variance between the indictment and the proof, in that the indictment alleges the deposit of $55 in money, whereas the proof shows the deposit of a check. Counsel rely upon the opinion in the case of *Morris v. State, supra,* to sustain their position that there is a variance between the indictment and the proof. The facts in that case were that the indictment

alleged the deposit of $100, while the deposit of $11 in money and the balance in checks. Objection was made to the introduction of testimony tending to show that the deposit consisted of checks, instead of currency; but the court said the contention was not sound as the proof was sufficient to show that $11 in currency were received and checks representing the balance of the amount alleged were received, as the offense under the statute was complete by knowingly receiving any amount of money and that it was not, therefore, necessary to prove the receipt of the full amount alleged. The court was not there called upon to decide, and did not decide, whether the proof would have been sufficient if the deposit had consisted entirely of checks.

Appellant further insists that the case of *State* v. *Smith,* 91 Ark. 1, is authority for his position that the indictment in the present case is defective. The indictment in that case alleged that the deposit consisted of a check, but it was not there alleged that the check was endorsed by the payee, nor that it was an obligation circulating as money. Discussing this question, it was there said:

"It is not altogether clear what the legislature meant by the words 'other notes, bills or drafts, circulating as money, or currency.' Literally construed, there are no 'notes, bills or drafts' which circulate as money or currency except United States treasury notes and national bank notes, and it is obvious that the legislature did not refer to these in using this language, for they are especially mentioned in the statute. If any meaning at all be given to this language, it must be held to refer to notes, bills or drafts (other than United States treasury notes and national bank notes) which pass from hand to hand; that is to say, such as are payable to bearer or are properly endorsed by the payee, so that the legal title may pass by delivery.

"Now, applying this test, the allegations of the indictment do not sufficiently describe the check so as to bring it within the terms of the statute. It is not alleged,

either in general terms that it was a 'note or draft circulating as money or currency,' or that the check which was drawn payable to Miss Bobbie Yocum was ever endorsed by her so that the legal title might pass by delivery.

"It is contended on behalf of the State that the allegation of the indictment to the effect that the check was accepted by the defendant in lieu of money was equivalent to an allegation that it was a draft circulating as money. We do not think so. The meaning of the two statements is altogether different. One is descriptive of the written instrument, and the other refers entirely to the manner of acceptance of the paper. It may as well be said that an allegation of acceptance on deposit of a horse or bale of cotton in lieu of money would bring it within the statute."

(7)    But no such defect is found in the indictment in the present case. The indictment is good, for it alleges the deposit of money, while the indictment in the Smith case, *supra,* alleged the deposit was a check without alleging that it circulated as money. The indictment there was disposed of on demurrer, and it was held void for the reasons stated.

A somewhat similar question was raised in the recent case of *Cunningham* v. *State,* 115 Ark. 392, 171 S. W. 885. The facts in that case were that a check was drawn by the collector of Sebastian County in favor of the treasurer of that county. The treasurer sent the check to the bank and received from it a receipt signed by Cunningham as cashier. The bank was insolvent at the time and closed its doors soon afterward. It was contended that this transaction was not within the terms of the statute under which the prosecution in the present case is had. But it was there said:

"The word 'draft,' as used in the section of the statute above quoted, is a general term and includes checks as well as other orders drawn for the payment of money. *State* v. *Warner,* 60 Kan. 94, 55 Pac. 342.

"When the cashier in the instant case received the check he charged the account of Norris with the amount

of the check and credited Harris with the amount thereof. It is claimed by counsel for the defendant that because no new money came into the bank that there was no violation of the statute. The money was in the bank, or was supposed to be there, and the transaction was considered and treated as though the cashier had actually paid over the money to Harris, and that Harris had immediately redeposited it in the same bank. The transaction was not essentially different from what it would have been had the whole amount of the check been received from other sources and then deposited in the bank. *State* v. *Shove,* 96 Wis. 1, 70 N. W. 312, 37 L. R. A. 142, 65 Am. St. Rep. 17.

"In Third Ruling Case Law, section 123, page 496, the author says: 'The deposit need not be a deposit of money, and although a portion of the money for which the certificate of deposit is issued by a bank consists of that represented by a prior certificate of deposit against the same bank and surrendered at the time that the last deposit is made, the last deposit and the certificate thereof must be treated as if the whole amount had been deposited in cash.' "

"Therefore, we are of the opinion that the contention of counsel for defendant is not well taken."

Attention is called to the fact that the indictment in the case of *State* v. *Smith, supra,* did not allege the deposit of a check drawn on the bank in which the deposit was made, and in this respect the case is distinguishable from the case of *Cunningham* v. *State, supra.*

The case of *Ellis* v. *State,* 119 N. W. 1110, 20 L. R. A. (N. S.) 444, was a prosecution under an indictment, the second count of which alleged the deposit of a check. The statute under which the indictment was drawn made it unlawful for an officer of an insolvent bank to receive money or paper circulating as money after knowledge of the bank's insolvency.. It was there contended that the receipt of a check did not come within the inhibition of the statute; but, in disposing of this question, the Supreme Court of Wisconsin said:

"The fact that the deposit relied upon in the second count in the indictment was a check does not militate against its satisfying the call of section 4541, Stat. 1898, for a deposit of money. True, the check, as it went over the counter, was not money, but it was treated as such between the bank and its customer. It was taken as the equivalent of money at the face value. The money equivalent was placed to the credit of the depositor the same in all respects, as if legal tender money had been passed over the counter. The relation of debtor and creditor, as between the bank and the depositor, with the characterization of liability on the one side and expectancy on the other as to payment on demand at any time within the banking hours, was created. In short, the transaction, in practical effect, was the same as if the bank had passed to its customer $1,000 for the check, and he had immediately passed the same back for deposit and received credit therefor."

A case very similar to the present case, and one in which the question now under consideration was raised and thoroughly considered, was that of *State* v. *Salmon,* 115 S. W. 1106. There the indictment alleged that one Paul had deposited with George Y. Salmon and Harvey W. Salmon, the owners of a private banking institution known as the "Salmon & Salmon Bank," "a certain deposit of money, towit, two hundred dollars, of the value of two hundred dollars, the money and property of one James Paul." The proof disclosed the fact to be that Paul presented to the bank a check for about $315 or $320 and was paid about $115 or $120 in money from the bank and was given a deposit slip for $200, which was the difference between the amount of the check and the amount he had received. Various objections to the introduction of this evidence were offered, and, among others, of course, that the proof was not responsive to the allegation of the indictment and that the proof of the deposit of a check could not support the charge of the deposit of money. The opinion in that case is very lengthy and

thoroughly well considered, and among other things it was there said:

"It is insisted by learned counsel for appellant that there was a total failure of proof on the part of the State of the offense charged, for the reason that the allegation in the indictment that the defendant assented to and received a deposit of $200 in money was not shown to have been true by evidence which showed a deposit of a check. In other words, such allegation of the deposit of money was not supported by the evidence. It is sufficient to say upon this proposition that if, by competent evidence, it should be shown that a check was drawn upon the bank of Salmon & Salmon in favor of James Paul, and this check was presented to the cashier for payment, and that said James Paul was paid partly in cash and the balance credited to his account in the bank, then in our opinion, in contemplation of law, such balance credited to his account was a deposit in such bank of so much money. This check was drawn upon the bank of Salmon & Salmon, and presented to that bank for payment, and when James Paul received such part in cash as he desired, and had the balance placed to his credit, this, in contemplation of law, was the payment to him of the amount of money called for in the check.

"We are unable to reach the conclusion that before this money could be treated as a deposit it was essential, first, that the cashier should count him out the entire amount of money called for in the check for the purpose of allowing him to retain what ready money he desired, and then return the balance for deposit in the bank. This, in our judgment, would be a useless formality, in fact would have been simply playing and trifling with a purely business transaction. This transaction can not be treated otherwise than a payment of the check in favor of James Paul.

"We shall not undertake to review all the authorities to which our attention has been directed. We have carefully reviewed them and find that they by no means settle

the proposition now under discussion. The law upon this proposition is well stated by Morse on Banks and Banking, section 569, where it is said: 'When a check is presented for deposit drawn on the depositary bank, the bank may refuse to pay it, or take it conditionally by express agreement, or by usage, if such a one exists, as in California; but otherwise, if it pays the money, or gives credit to the depositor, the transaction is closed between the bank and the depositor, unless the paper proves not to be genuine, or there is fraud on the part of the depositor. The giving of credit is practically and legally the same as paying the money to the depositor, and receiving the cash again on deposit. The intent of the parties must govern, and presenting a check on the bank, with a passbook in which the receiving teller notes the amount of the check, is sufficient indication of intent to deposit, and to receive as cash.' "

(8) It is also insisted that the proof fails to show that the bank was insolvent, and that the court erred in its declarations of law as to when a bank is insolvent. While the proof is conflicting as to the value of the bank's securities upon which money had been loaned, and as to the causes for its suspension from business, we think the proof legally sufficient to support the finding that the bank was in fact insolvent at the time Janet's deposit was made, and that appellant was aware of that fact when he received it. Nevertheless, it is true that, according to appellant's evidence, the bank was not insolvent, and would not have suspended business, nor would it have failed to respond to the demands of its depositors and other creditors, but for the fact that its correspondent bank failed to extend the usual and expected credit, and because of the failure to collect certain moneys as soon as had been anticipated.

(9) The court gave an instruction numbered 5, in which insolvency was defined. That instruction is as follows:

"5. Now, upon the question of insolvency, you are instructed that the bank was insolvent in the sense used

in the indictment, first, if the bank at the time of the deposit referred to in the indictment by Joe Janet did not have assets sufficient to pay its debts; second, if the bank was financially unable to pay its debts or obligations when they became due. Now, this inability to pay its debts does not mean a temporary inability to pay its debts such as might occur when there is a 'run on the bank' or failure of the officers of the bank to have enough available cash on any particular day to run the bank that day, or because of any other emergency, but it means an inability to meet the bank's obligations or debts and pay depositors in the ordinary course of business when given such a reasonable time to get the money as might be expected or required by a bank in carrying on its banking business.

"In other words, if the bank, under ordinary and usual circumstances, was unable to get the money by putting up its collateral and credit to pay its debts or depositors as same became due and presented for payment in the ordinary course of its business, it was insolvent in the sense used in the indictment."

We think this a very fair and accurate statement of the law and as favorable to appellant as he could ask. *Ellis* v. *State,* 20 L. R. A. (N. S.) 444, and cases there cited. Over appellant's objection, however, the court gave on this question of insolvency the following instruction:

"4. The terms debts, liabilities or obligations as used in the instructions means all debts or obligations of every kind owing by the bank to other persons, including deposits, certificates of deposits, checks unpaid, bills payable, certificates of capital stock, surplus and undivided profits."

(10) We think the giving of this instruction was error which calls for the reversal of the case. If this instruction was correct, any bank would be insolvent which had sustained a loss of sufficient size as to make the book value of its stock worth less than par. A bank might be entirely solvent so far as all of its creditors were con-

cerned, and yet its stock not be actually worth par.  This question was discussed in the case of *State* v. *Myers,* 38 . ' Pac. 296, and the Supreme Court of Kansas there said:

"In a criminal prosecution against an officer of the bank for knowingly receiving deposits when the bank was insolvent, the capital stock and surplus fund can not be considered as liabilities or debts in determining the insolvency; otherwise, the greater the capital of the bank, and the larger its surplus fund, the more insolvent it will be. The contrary is the actual fact.  The capital and surplus of a bank are its resources, which may be used to pay its depositors and other creditors when there have been losses, by loans or otherwise.  If a bank, by using its capital or surplus, or both, can pay promptly its deposits and other debts, * * * it is not insolvent.  Upon the book and in the official statements of a bank, capital stock and the surplus fund are denominated as 'liabilities,' but they are resources of the bank with which to transact its business.  The more capital a bank has, the better able it is to meet its deposits and other debts.  The more surplus on hand, the greater its ability to pay promptly its deposits and other debts.  If a bank is able to pay promptly every depositor and every other creditor in the ordinary course of business, the bank, under section 16 of said chapter 43, is solvent, whether there is any surplus or capital to be distributed afterward to stockholders or not.  Section 16 was adopted by the Legislature for the protection of the depositors, not for the benefit of the officers or stockholders of the bank."

(11)    After the failure of the bank a Mrs. Zearing was appointed receiver, and she had served in that capacity for about a year and a half prior to the time of the trial below.  She had been employed in the bank as a bookkeeper prior to its failure.  She was shown to have had entire familiarity with all the affairs of the bank, and after testifying at length about the value of the bank's assets and the extent of its liabilities, and after having stated that she was acquainted with the parties who owed

the bank and that she had made an investigation of their financial standing, she was asked the following questions:

"From your investigation and from your acquaintance with these parties, state whether or not you may reasonably expect to collect all these notes and overdrafts, or about all of them? And, further, are the overdrafts which you have in your possession valueless or are they good?"

We think the witness should have been permitted to answer these questions. The answer would have been competent and relevant, and the court erred in its exclusion.

For the errors indicated the judgment of the court must be reversed and the cause will be remanded.

KIRBY, J., dissents.