IN RE RECEIVERSHIP OF MEDIAPOLIS STATE BANK.

D. W. BATES, Superintendent of Banking, v. MEDIAPOLIS STATE BANK.

MRS. T. W. BURRUS et al., Claimants, Appellees, v. D. W. BATES, Appellant.

No. 42569.

JUNE 21, 1935.

Edward L. O'Connor, Attorney General, Lehan T. Ryan, Assistant Attorney General, (Max A. Conrad and R. T. Conrad, of counsel), for appellant.

Seerley, Clark & Hale, for appellees.

MITCHELL, J.—Mrs. T. W. Burrus and Mrs. Carrie Lowrey were depositors in the Mediapolis State Bank, a savings bank which was operating under the general banking laws prior to the 4th day of January, 1933, on which day it was adjudged insolvent and placed in charge of L. A. Andrew, Superintendent of Banking of the State of Iowa, as receiver, who later was succeeded by D. W. Bates as receiver. Mrs. Lowrey had on deposit something over $800, and Mrs. Burrus, her daughter had a little over $700. The bank had had some difficulties, it appears, and waivers prior to this time had been signed by the depositors, including the two claimants in this case. The appellees in November of 1932 went to the bank and talked with officials of the bank, informing them that they were buying a piece of land and would need the money or part of it by the first of January. The waivers which they had signed would expire on January 1st. On the 3d day of January, 1933, Mrs. Burrus presented for payment at the Mediapolis State Bank two checks, one for $700 drawn on her account and one for $600 drawn on the account of Mrs. Lowrey, the other claimant in this case. The cashier to whom the checks were presented said that only 10 per cent of the amount of the check could be paid at that time; that that was all they were paying depositors. Mrs. Burrus explained to him that they had spoken to the officials of the bank about needing the money the first of the year; that the waivers had expired, and that the money was needed to make payments on a land deal. The cashier then consulted with the president of the bank and the president convinced Mrs. Burrus to take drafts for the amounts, she stating at the time that she supposed the drafts would be acceptable to the man from whom they were purchasing the land. Drafts were executed and delivered for the amounts, drawn upon a Chicago bank, in which the Mediapolis Bank had sufficient deposited at the time to take care of the drafts. At the close of business that day the bank closed, never to reopen.

The claimants filed their drafts as preferred claims. The receiver in his report reduced them to depositors' claims. Claimants filed objections and asked that they be allowed as preferred claims. The lower court sustained their pleadings and ordered payment accordingly. The receiver appeals. By agreement the two claims, being based upon exactly the same facts, were tried together and were submitted together in this court.

Section 9239-c1 of the 1931 Code is as follows:

"Any draft drawn and issued by any bank or trust company prior to its failure or closing and given in payment of clearings and any money paid in the usual course of business to any bank, or trust company for the purchase of a draft for the bona fide transfer of funds shall be a preferred claim against the assets of the bank or trust company."

Passed originally by the 43d General Assembly (Chapter 30, section 11) in an attempt by that body to remedy an injustice caused by the holding of this court to the effect that drafts and cashier's checks were not to be preferred upon the liquidation of insolvent banks, this statute was amended to its present form, providing for drafts only, by the 44th General Assembly (Chapter 202). The fact that a party is a holder of a draft clearly is not alone sufficient to entitle him to a preference under the provisions of this statute. Its specific and restrictive language singly supports the observation that such was not the intent of the legislature. Under its provisions two classes of drafts issued by a bank or trust company prior to its failure or closing are given preference, namely: First, those given in payment of clearings; second, those given for money paid in the usual course of business for the bona fide transfer of funds. In the case at bar we are not confronted with the first classification, as appellees make no claim under the same. Appellees, if they are to recover in this case, must show that the drafts upon which they predicate their claims of preference are clearly within the second classification. We are thus confronted with the vital question of bona fides in the transaction. If it were a mere subterfuge to get a supposed advantage, it was a failure. If, on the contrary, use of the drafts was to complete the purchase of land, then, clearly, under the decisions of this court, the order of the lower court was right and the case should be affirmed. We must thus turn to the record to ascertain the facts.

The claimants had money on deposit in the bank. Some time prior, with other depositors, they had signed a waiver not to withdraw their money. That waiver had expired. In November they went to the bank and informed the officials that they were buying a piece of real estate and would need this money the first of the year. On January 3d they presented their checks, drawn on their account, to the cashier of the bank. The checks

they presented were not for the full amount of their deposits. At the time they were presented the claimants were entitled to withdraw the money and the bank had sufficient cash on hand to pay these checks in full. Upon presentation of the checks to the cashier he told them the bank was only paying ten per cent of the deposits. They informed him that they had been in the bank in November and talked with the officials of the bank about needing the money the first of the year to pay upon a land deal that they had entered into. The cashier then consulted with the president of the bank, who convinced the claimants that in place of taking the cash, drafts would be all right, and the bank issued to them drafts for the amounts of the checks. At the time the drafts were drawn upon the Chicago bank there was sufficient money in the account of the Chicago bank due and owing to the Mediapolis Bank to pay these drafts. No one can read this record and come to any other conclusion but that the land deal for which the claimants were securing the money was a good faith transaction. The only evidence offered is the evidence of the claimants themselves. They had given the bank due warning six weeks before that they would need the money the first of the year. They had told the officials of the reason for needing the money, namely, the buying of a piece of land. There was no run on the bank at the time that the checks were presented; in fact, the bank was at that time receiving deposits. The purpose for which the drafts were secured by these claimants was to make a payment upon the land deal that they had entered into, which was a good-faith transaction.

But the appellant claims that, even if the drafts were issued in the usual course of business for the bona fide transfer of funds, to comply with the statute money must be paid to the bank for the drafts. The statute says, "any money paid in the usual course of business." This phrase presents the question of what may be regarded as payment of money for the purchase of a draft in the usual course of business within the meaning of the statute. In the case at bar checks were presented upon deposits in the bank. At the time the checks were presented there was in the bank, and at all times thereafter until the bank closed, sufficient money to pay the checks of these claimants.

In the case of Messenger v. Carroll Trust & Savings Bank, 193 Iowa 608, 187 N. W. 545, the claimant sent a draft, bill of lading attached, the latter to be delivered upon payment of the

draft. The drawee gave his check against funds in the bank and the bank sent its draft on a Chicago bank to claimant. It was earnestly contended upon the trial that because of the method of collection the proceeds never had any distinct entity. It developed, however, that the bank had on hand at all times more than the amount of the draft. And this court, at page 610, said:

"That this method of collection was the full equivalent of the payment of money by the Swaney Company and served to the augmentation of the assets of the bank in precisely the same manner as the delivery of currency would have done, is held in the following authorities: British & Am. Mtg. Co. v. Tibballs, 63 Iowa 468, 19 N. W. 319; Page County v. Rose, 130 Iowa 296, 106 N. W. 744, 5 L. R. A. (N. S.) 886, 8 Ann. Cas. 114; Kansas State Bank v. First State Bank, 62 Kan. 788, 64 P. 634; State Nat. Bank v. First Nat. Bank, 124 Ark. 531, 187 S. W. 673; National Life Ins. Co. v. Mather, 118 Ill. App. 491; Arnot v. Bingham, 55 Hun 553, 9 N. Y. S. 68; People v. Merchants Bank, 92 Hun 159, 36 N. Y. S. 989; Cunningham v. State, 115 Ark. 392, 171 S. W. 885; Skarda v. State, 118 Ark. 176, 175 S. W. 1190, Ann. Cas. 1916E, 586; People v. City Bank of Rochester, 96 N. Y. 32; Capital Nat. Bank v. Coldwater Nat. Bank, 49 Neb. 786, 69 N. W. 115, 59 Am. St. Rep. 572.

"We deem it clear that the net result of the transaction of payment by the Swaney Company and the receipt thereof by the collecting bank was the same as though the Swaney Company had drawn the currency into its own hands by means of check, and had thereupon delivered the same to the collecting bank in payment of the sight draft."

In the case at bar the Mediapolis Bank had sufficient money on hand to pay these checks when presented. The officials of the bank convinced the claimants that they should take drafts. It would have been an idle ceremony to have had the checks cashed, the money turned over to these claimants, and then to have paid it back to the bank for the drafts. There was sufficient money in the Chicago bank upon which the drafts were drawn to pay these drafts at the time they were drawn and at all times up to the closing of the bank.

In the case of Andrew v. Farmers & Merchants Savings Bank, 215 Iowa 1336, l. c. 1345, 245 N. W. 226, 230, this court said:

"It will thus be noted that in each of the three cited cases, the bank had sufficient money or cash on hand with which to pay the obligation had money been demanded. And we quite properly held that the law does not require the doing of idle or useless things."

Judgment and decree of the lower court must be, and it is hereby, affirmed.

ANDERSON, C. J., and KINTZINGER, HAMILTON, POWERS, DONEGAN, PARSONS, and ALBERT, JJ., concur.