THE KANSAS STATE BANK v. THE FIRST STATE BANK *et al.*

No. 11,909.* (64 Pac. 634.)

1. TRUSTS AND TRUSTEES — *Insolvent Bank — Check for Collection.* Where a check is sent to a bank for collection, and such bank, after collection, retains and uses the proceeds of the check in its general business, it will be deemed to be an agent and trustee of the owner of the check, and the money so wrongfully re-

*For opinion by the court of appeals, see 9 Kan. App. 839, 61 Pac. 868. — REP.

Bank v. Bank.

tained and used to be a trust fund, which the owner may follow and reclaim, if it can be identified, and the rights of no innocent third parties have intervened.

2. ———— *Assets Appreciably Augmented — Trust Impressed.* If the trust fund has been mingled with other assets of the trustee, and it appears that such assets have been thereby appreciably augmented and bettered, a trust will be impressed on such assets, and the *cestui que trust* will be entitled to have the trust fund reclaimed and taken out of the assets with which it is mingled.

3. ———— *Clearing-house Transactions not Payment of Debts.* The use of the money so collected for the mere payment of the indebtedness of the trustee is not to be regarded as an enlargement and betterment of the trustee's estate; but the plan of exchanging checks and making a settlement of the day's business which was adopted by the banks in the present case is not to be regarded as a mere payment of indebtedness.

Error from court of appeals, southern department; A. W. DENNISON, B. F. MILTON, and M. SCHOONOVER, judges. Opinion filed April 6, 1901. *In banc.* Reversed.

*W. H. Carpenter*, for plaintiff in error.

*King & Kelley*, for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J. : The Kansas State Bank, of Peabody, as owner and *cestui que trust*, seeks to reclaim a portion of the estate of the First State Bank, of Marion, which it alleges is and should be regarded as a trust fund. On May 6, 1898, the bank commissioner, finding the First State Bank to be insolvent, closed its doors, took possession of its property, and soon afterward S. Burkholder was appointed receiver of it. On April 30, 1898, a check for $1400, drawn on the Bank of Commerce, of Marion, was presented to and cashed by the Kansas State Bank, of Peabody. The latter bank forwarded it to the Citizens' National Bank, of

Kansas City, Missouri, for collection, which acknowledged the receipt of the check on May 3, 1898, and on the receipt there was this statement: "This bank, in receiving collections payable elsewhere than in Kansas City, Mo., acts only as your agent, and assumes no responsibility beyond due diligence on its part." The Citizens' National Bank at once forwarded the check to the First State Bank of Marion for collection and remittance, and it was received by that bank and paid by the Bank of Commerce, on which it was drawn, on May 4, 1898.

No money actually passed when the payment was made, but the check was paid in accordance with the prevailing practice of an exchange of checks between the banks at the close of a day's business. For instance, a representative of the First State Bank would take such checks on the Bank of Commerce as it had cashed during the day, and exchange them for checks drawn on the First State Bank which the Bank of Commerce had taken in during the day. If the checks presented by the First State Bank exceeded those presented by the Bank of Commerce, the latter bank paid the difference in currency to the First State Bank; and if the checks presented by the Bank of Commerce exceeded those held by the First State Bank, the latter gave the Bank of Commerce a cashier's check for the balance. When a representative of the Bank of Commerce went to the First State Bank to balance accounts and make settlement of the day's business, as it did one-half the time, and there was a balance in favor of the Bank of Commerce, the First State Bank paid such balance in cash; but if it was against the Bank of Commerce, it would give the other a cashier's check. In other words, the bank at which the balance was struck paid any balance against it in

cash, while a visiting representative of the other bank paid any balance against his bank by a cashier's check.

On May 4, 1898, a representative of the First State Bank went to the Bank of Commerce to exchange checks, and carried with him the $1400 check sent for collection by the Citizens' National Bank of Kansas City, and when a balance was struck it was found that the checks held by the Bank of Commerce exceeded those presented by the First State Bank in the sum of $615.58, and for that balance the First State Bank gave the Bank of Commerce a cashier's check.  Included in the paper held by the Bank of Commerce against the other bank and exchanged that day were two cashier's checks issued by the First State Bank, amounting to $1446.91, as well as checks drawn by individuals on the First State Bank for a considerable amount.  According to the books of the First State Bank, it had over $2900 in cash on hand on May 4, when the check in question was paid.  On the day following the bank continued to receive and pay out money and carry on the general business of the bank, and it appears to have paid out to one person on that day over $1200.  When the bank was closed, on May 6, 1898, by the bank commissioner, the assets were estimated to be from $16,000 to $23,000, and the cash on hand only amounted to $363.45.  The liabilities of the bank were estimated to be over $40,000.

It is claimed by the receiver that the assets in his hands are not impressed with a trust, and that the Kansas State Bank is not entitled to a preference, because no money was actually paid by the Bank of Commerce on the $1400 check; that the estate which came into the hands of the receiver was not augmented

or bettered by the payment of the check, and that the proceeds of the check are, therefore, not traceable to the hands of the receiver.

An examination of the pleadings and the evidence in the case makes it clear that the Kansas State Bank was the owner of the check, and that the Citizens' National Bank of Kansas City, as well as the First State Bank, were its agents for its collection. Upon receiving the check, it was the duty of the First State Bank to present it to the Bank of Commerce, receive payment in money or its equivalent, and to remit the proceeds at once to the sender. The money collected belonged to the Kansas State Bank, and the relation between it and the First State Bank was that of principal and agent, and not that of creditor and debtor. The right of the principal owner of the fund derived from the collection of the check to follow and reclaim it is determinable by rules frequently applied in this state. In *Peak v. Ellicott, Assignee,* 30 Kan. 156, 1 Pac. 499, it was held that money so obtained by a bank constitutes a trust fund, which the owner may follow and reclaim from the bank, or from an assignee of the bank. In that case the manner of identifying and tracing the trust fund received but little attention, but it was said:

"If the trust fund has been mixed with other funds of the bank, this cannot prevent the plaintiff from following and reclaiming the fund, because, if a trust fund is mixed with other funds, the person equitably entitled thereto may follow it, and has a charge on the whole fund for the amount due."

The matter of identifying a trust fund wrongfully retained and mingled with the money and assets of a bank received attention in *Myers v. Board of Education,* 51 Kan. 87, 32 Pac. 658. It was there held that if

the trust fund can be traced into assets of a trustee it may be reclaimed, and it is immaterial whether the property with which the trust fund was mingled was bills, notes, securities, lands, or other assets; and that if a bank carrying on a general business converted and mingled the trust fund with assets of that character, and to that extent augmented them, it would constitute a charge on the entire assets so enlarged.

In *Hubbard v. Irrigating Co.*, 53 Kan. 637, 36 Pac. 1053, 37 Pac. 625, it was said that in cases like this one courts proceed on the theory that no title to the trust fund ever passes to the trustee, and however it has been mingled with other property the title still remains in the *cestui que trust;* and, further, that an assignee into whose hands the fund comes must pay over the trust fund to its owner in advance of payment to general creditors. The case was decided upon the theory that the estate with which the trust fund was mingled was increased and benefited by the conversion of the trust fund.

In *Burrows v. Johntz,* 57 Kan. 778, 48 Pac. 27, bankers who had received a trust fund made an assignment. An attempt was made by the owner of the fund to recover it from the assignee. It was not shown that the fund or any property into which it had been converted ever went into the hands of the assignee, and it was therefore held :

"To render an assignee liable to account to a party who had placed money in the hands of his assignor as for a trust fund, it must appear either that the fund actually came into the hands of the assignee, or that it went to swell the estate of the assignor, which he in fact received."

It was further held that the mere fact that the fund had passed into the hands of the assignor a short time

before the assignment did not warrant the presumption that the money came into the hands of the assignee or had never been repaid to the owner.

In some of the cited cases the doctrine of the impressibility of insolvent estates with trusts was carried to the full length, and language is used which, taken apart from the facts in the cases, might give countenance to a rule that if the trust fund had been used by the trustee even for the payment of his general indebtedness, and without increasing the estate which passed to his assignee, it would be sufficient to charge the whole estate with a trust. In *Insurance Co. v. Caldwell*, 59 Kan. 156, 52 Pac. 440, the former cases were reviewed to some extent, and the doctrine, with its limitations, carefully restated. It was there held :

"The fund itself, or something into which it has gone and which stands as its representative, must be on hand, subject to identification and separable from the general assets, in order to charge the assignee with the trust ; or, if the fund has been so commingled with the general assets as to be incapable of identifition or tracing, the estate which came to the assignee must have been augmented or bettered, in an appreciable and tangible way, in order to charge it with the trust. The mere saving of the estate by the discharge of general indebtedness otherwise payable out of it, or by the payment of the current expenses of the business, is not an augmentation or betterment of the estate, within the meaning of the rule. If the estate has not been increased by specific additions to it, or if what previously existed has not been improved or rendered more valuable, it has not been impressed with the trust claimed."

Under these rules, can the money collected on the check be traced into the hands of the receiver and reclaimed from him ? He has no better title to the assets

of the insolvent bank than the bank itself had, and if the money collected upon the check was held by the bank as a trust fund when it failed, it would be subject to the trust after it was turned over to the receiver. Equity follows a trust fund through any number of changes and allows an owner to reclaim it when and wherever it can be identified. It matters not how much it may have been changed, either in form or character, it still belongs to the owner, and if it, or its fruits or substitute, can be found among the assets of the trustee, the amount of the fund may be taken out of such assets, providing no superior rights of innocent third parties have intervened.

According to the testimony, the trust fund is fairly traceable into the property and assets of the insolvent bank. When the money was collected the bank was a going concern, receiving and paying out money, and it continued to transact a general banking business after the money was collected, on May 4, until the closing of the bank, on May 6. In the interim it had some quite large transactions with its customers, and, as we have seen, paid out over $1200 to one man on the day after the check was paid. The books of the bank show that on the day of payment there was over $2900 of cash on hand, and over $15,000 in loans and discounts, besides other assets and resources. If the $1400 collected on the check went into the vaults of the bank or into loans or discounts, or was employed in the ordinary course of banking business from the time it was received until the bank was closed, it would to that extent enlarge the assets of the bank and be a charge against them.

The contention is made that because the $1400 was exchanged for outstanding checks of the First State Bank no money was in fact collected, and that, there-

fore, the proceeds of the check did not go into the business or assets of the bank. It is claimed that the checks for which the $1400 check was exchanged were debts of the bank, and that the discharge of those debts, or the use of the money in payment of general indebtedness, did not operate to swell the estate or bring the fund within the rule of the authorities cited. In our opinion, the process employed by the banks in striking balances and making settlement between them of the day's business is not to be regarded as the payment of debts. Each bank took up the checks of the other when they were presented by its own customers, and the daily settlements were made in due course of business and as a matter of convenience. The First State Bank could have taken up the checks of the Bank of Commerce, presented them at the counter of the latter and obtained the currency for them, and the Bank of Commerce could in turn have carried the checks which it had taken up to the First State Bank and collected the currency over the counters of that bank. To avoid inconvenience and needless labor, a plan of clearances and settlements, heretofore described, was adopted, and, as it was done in the regular course of business, it is to be regarded as an improved method of carrying on the general banking business, rather than as the mere discharge of debts. If the currency had been collected from the Bank of Commerce, placed in the till with other moneys of the First State Bank, used generally in paying the checks of the depositors, making loans and discounts, buying and selling exchange, and had gone into the general business of the bank, it would have been conceded that the fund had increased the assets of the bank and had augmented and bettered the estate which went into the hands of the receiver. In

our view, the plan of exchanging checks and making clearances is substantially the same as if the cash had been paid for the check and then mingled and used with the other moneys and assets of the bank in carrying on its general business.

From the testimony, it appears to us that the trust fund went into and enlarged the assets of the bank, and that it was a part of the estate which passed into the hands of the receiver, and is, therefore, a charge upon it. As the finding and decision of the trial court were not in accord with the principles and views stated, its judgment must be set aside and a new trial had. In another trial the question of whether the proceeds of the check actually augmented the estate will open for consideration, and fuller proof may then be produced.

It follows, from the views expressed, that the judgments of the court of appeals and of the district court must be reversed and a new trial awarded.