**AUSTIN, Banking Com'r, et al. v. LACY et al.**
**(No. 3486.)**

Court of Civil Appeals of Texas. Texarkana.
Feb. 1, 1928.

Rehearing Denied Feb. 16, 1928.

**1. Banks and banking** ⚖➲80(7)—**Bank receiving deposit, knowing insolvency, is trustee, and depositor may recover deposit, if it can be identified, or its equivalent, if not, when mingled fund in receiver's hands equals deposit.**

Bank receiving deposit with knowledge of its insolvency perpetrates fraud, and is constructive trustee of the deposit, and depositor may recover of receiver the deposit, if it can be identified, or its equivalent, if it cannot be identified, when mingled fund passing to receiver equals amount of deposit.

**2. Banks and banking** ⚖➲80(7)—**Right to reclaim bank deposit is same whether funds were secured by fraud, based on insolvency, or deposited as trust funds.**

Right of depositor to follow and reclaim funds deposited in bank is the same whether funds were secured by fraud, based on insolvency, or were deposited to be held as trust funds.

**3. Banks and banking** ⚖➲80(7)—**Where funds are deposited in bank for safe-keeping, trust relation arises.**

Where funds are deposited in bank for safe-keeping, title does not pass, and relation of trustee and cestui que trust arises.

**4. Banks and banking** ⚖➲76—**Where bank receives deposit knowing insolvency, depositor may rescind and reclaim deposit or affirm, and right to recover deposit or its converted form rests on right to title.**

Where bank receives deposit with knowledge of its insolvency, and thereby perpetrates fraud, depositor may either rescind contract and reclaim deposit, or affirm and pursue other remedies, and in either case right to recover specific property or that to which it has been converted is based on right to title, not right to compensation for its loss.

**5. Banks and banking** ⚖➲80(10)—**In suit for preference against assets of insolvent bank, record held to show that property of decedent's estate was not money, but obligation to pay money.**

In suit to establish preference against assets of insolvent bank, record *held* to show that estate of decedent was not composed of money, but of interest-bearing obligation to pay money on demand.

**6. Banks and banking** ⚖➲80(10)—**In suit for preference against assets of insolvent bank, record held to show that bank, if administrator's collecting agent, received no money.**

In suit to establish preference against assets of insolvent bank, record *held* to show bank, if collecting agent for administrator who deposited drafts with it, received no money for drafts, but merely cancellation of its debts.

**7. Banks and banking** ⚖➲80(10)—**Record held to show that administrator sold drafts to insolvent bank, in suit for preference.**

Record *held* to show that administrator of decedent's estate sold drafts to bank instead of placing them there for collection, in suit to establish preference against its assets.

**8. Banks and banking** ⚖➲80(7)—**Trust ceases and beneficiary's remedy becomes that of common creditor where rights of third parties intervene and defeat reclamation.**

Trust ceases and remedy of beneficiary is reduced to that of common creditor, where trust funds are used by trustee in payment of his own debts, or for any other reason rights of third parties intervene and defeat right to reclamation by beneficiary.

**9. Banks and banking ⊛➠126—Where "drafts" were deposited as money, and credit therefor taken on bank's books, relation of debtor and creditor arose.**

Where "drafts" were deposited in bank by administrator as money, and credit therefor taken on books of bank, title to drafts passed to bank, in absence of fraud or agreement to contrary, and relation of debtor and creditor arose; "draft" being form of commercial paper, a distinct commodity, which may be subject-matter of title and ownership.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Draft (in Commercial Law).]

**10. Banks and banking ⊛➠80(7)—Facts held to show that insolvent bank accepting deposit of drafts had no money belonging to depositor, and not to warrant preference.**

Where administrator deposited drafts belonging to decedent's estate in insolvent bank, facts *held* to show that bank had no money belonging to estate, and not to warrant preference on that ground.

**11. Banks and banking ⊛➠80(7)—Use of drafts deposited by administrator to pay bank's debts did not augment its assets so as to entitle estate to preference.**

Use of drafts deposited by administrator to pay bank's debts to another bank did not augment assets of insolvent bank in such manner as to entitle estate of decedent to preference over general depositors.

**12. Banks and banking ⊛➠80(7)—Facts held to show that transfer of deposit to capital stock was bookkeeping, and did not add to bank's assets so as to warrant preference.**

Where administrator deposited drafts with insolvent bank, facts *held* to show that transfer of deposit by bank to capital stock was mere bookkeeping, and that nothing was added to assets of bank so as to entitle estate to preference over general creditors.

**13. Banks and banking ⊛➠15—Where drafts were deposited by administrator as money and credit taken on bank's books, estate held "depositor" within statute authorizing recourse against guaranty fund.**

Where drafts were deposited in insolvent bank by administrator of decedent's estate as money, and credit therefor was taken on books of estate, *held* "depositor" within meaning of statute authorizing recourse against state guaranty fund.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Depositor.]

**14. Banks and banking ⊛➠15—Decedent's estate held not precluded from recovering against bank guaranty fund on ground that deposit was interest bearing and secured.**

Estate of decedent *held* not precluded from recovering against bank guaranty fund on ground that deposit in bank was interest bearing and secured, where administrator had not loaned money to bank at interest, and alleged security was administrator's bond.

Appeal from District Court, Gregg County; P. O. Beard, Judge.

Suit by Edwin Lacy and others against Chas. O. Austin, Banking Commissioner, Commercial Guaranty State Bank, and others. From a judgment in favor of plaintiffs, the named defendants appeal. Reformed, and, as reformed, affirmed.

Jno. W. Goodwin and John W. Brady, both of Austin, and Scott & Casey, of Marshall, for appellants.

Edwin Lacy and Ras Young, both of Longview, Guinn & Guinn, of Rusk, and F. H. Prendergast, of Marshall, for appellees.

HODGES, J. In March, 1926, Jim Mitchell, of Gregg county, Tex., died, leaving a will in which he disposed of an estate valued at something more than $25,000. The estate consisted of $42 on deposit in the Commercial Guaranty State Bank of Longview, and an interest-bearing deposit of $25,029.34 in the Republic National Bank of Dallas, together with $500.68 as accrued interest. Only a life interest in the property was devised to his wife, Mrs. Callie Mitchell, who was his only heir. The remainder was placed in the hands of his executors as a trust fund for other purposes. F. B. Guinn and Jake Cullum, Jr., of Cherokee county, were named as executors. When the will was presented for probate, it was contested by Mrs. Mitchell upon grounds which need not be here noticed. During the pendency of the contest, J. R. Sparkman, then president of the Commercial Guaranty State Bank of Longview, was appointed temporary administrator. In the order of appointment, Sparkman was directed to loan the money to some bank at 4 per cent. interest per annum, or invest it in government bonds. Sparkman qualified by giving bond in the sum of $10,000, with J. G. Pegues and A. L. Connor as sureties. On April 30, 1926, after his appointment, Sparkman drew a draft on the Republic National Bank of Dallas for $25,029.34, and on May 3 following he drew another draft on the same bank for $500.68. The second draft was for the interest which had accumulated on the principal of the interest-bearing deposit in the Dallas bank. Both of those drafts were delivered to the Commercial Guaranty State Bank of Longview, and credits equal to the face value of the drafts were entered on the books of that bank in favor of Sparkman as temporary administrator. The drafts were transmitted to, and honored by, the Republic National Bank of Dallas by entering on its books corresponding credits in favor of the Longview bank. Subsequent to these transactions Sparkman drew out of the Longview bank approximately $258 for the purpose of paying some legitimate charges against the

Mitchell estate. The remainder of the credits was treated as a noninterest-bearing deposit. On September 26, 1926, the will contest was compromised and settled, and a judgment entered awarding $10,000 of the estate to the executors as a trust fund with which to carry out the provisions of the will, and the remainder to Mrs. Mitchell. For the purpose of prosecuting the contest, Mrs. Mitchell had employed as her attorney Edwin Lacy of Longview, and had contracted to pay him one-third of the amount she might recover on the contest. On September 30, a few days after the contest was settled, the Commercial Guaranty State Bank closed its doors, and its assets passed into the hands of the state banking commissioner for liquidation. The commissioner thereafter refused to allow claims in favor of the executors and Mrs. Mitchell for the amount of the Mitchell estate, either as a preferred charge against the assets of the bank or as a general charge against the state guaranty fund. This suit was then filed by the executors, joined by Mrs. Mitchell and Edwin Lacy, against the Commercial Guaranty State Bank, Austin as banking commissioner, and the sureties on Sparkman's bond.

In addition to the facts above stated, the proof shows that, at the time Sparkman drew the drafts on the Dallas bank, and received the credits on the books of the Longview bank, the latter was insolvent; that such insolvency was known to its officers, and was unknown to the owners of the estate and executors.

The following conclusions of law form the basis of the judgment entered in the court below against the appellants, the Commercial Guaranty State Bank and the banking commissioner:

"(1) When J. R. Sparkman, as temporary administrator, deposited the money of the Mitchell estate in the Commercial Guaranty State Bank of Longview, knowing at the time that the bank was in an insolvent condition, that such deposit became a special deposit, and that the plaintiffs by reason thereof are entitled to preferential payment out of the funds of the Commercial Guaranty State Bank now in the hands of the Banking Commissioner.

"(2) If I am mistaken as to the above conclusions of law, then I conclude that the account of J. R. Sparkman, temporary administrator, in said Commercial Guaranty State Bank, amounting to $25,272.02, is an unsecured noninterest-bearing deposit in said bank, and is a charge against the guaranty fund in the hands of the banking commissioner."

[1] While the trial court based his legal conclusions, allowing priority upon the insolvency of the bank, which gave rise to a constructive trust, the appellees in their pleadings also claim an express trust upon the ground that the bank received money belonging to the estate as a special deposit. The general rule applicable to cases where the trust arises from insolvency of a bank is thus stated by the Virginia court in Board of Supervisors v. Prince Edward County, 138 Va. 333, 121 S. E. 903, 37 A. L. R. 604:

"The authorities are agreed that when a bank, with knowledge of its insolvency, receives a deposit, it perpetuates a fraud on the customer, and is held to be a constructive trustee of the deposit, and the depositor may recover of the receiver the deposit if it can be identified, or its equivalent if it cannot be identified, when the customer's money has been mingled with the bank's funds, which, to an amount equal to the deposit, has gone into the hands of its receiver."

In the case of Hall v. San Jacinto State Bank (Tex. Civ. App.) 255 S. W. 510, the Commission of Appeals used this language:

"Moreover, as the Shepherd State Bank was insolvent, and knew itself to be insolvent at the time it became depository and received credits for the county's money in San Jacinto State Bank, this was such fraud as vitiated the depository contract and entitled appellee San Jacinto county to recover the money. Richardson v. New Orleans Debenture Redemption Co., 102 F. 780, 42 C. C. A. 619, 52 L. R. A. 67; Orme v. Baker, 74 Ohio St. 337, 78 N. E. 439, 113 Am. St. Rep. 968; Corn Exchange National Bank v. Trust Co., 188 Pa. 330, 41 A. 536, 68 Am. St. Rep. 872. Especially is this true, as the money is shown certainly to be a portion of the county's fund that was in the San Jacinto State Bank before the Shepherd State Bank became depository, and, as the depository contract was secured by fraud, the title to the money did not pass. Richardson v. New Orleans Coffee Co., 102 F. 785, 43 C. C. A. 583."

[2-4] The right to follow and reclaim funds deposited in a bank is the same whether the funds were secured by fraud based upon insolvency, or were deposited under contract to be held as trust funds. When funds are merely deposited for safe-keeping, it is not intended that the title shall pass, and the relation of trustee and cestui que trust is the result of contract. The right to reclaim funds from an insolvent bank is based upon the right to rescind the contract of deposit. That right of rescission presupposes that but for the fraud of the bank it would acquire title to the funds placed in its hands, and the relation of debtor and creditor would arise between it and the depositor. In such cases the law permits the victim of the fraud to elect between repudiating the contract of deposit and reclaiming his property or affirming the contract and pursuing other appropriate legal remedies. In either case the right to recover the specific property, or that into which it has been converted, is based upon the right to claim title to the property, and not compensation for its loss. Burnham v. Barth, 89 Wis. 367, 62 N. W. 96; Dowie v. Humphrey, 91 Wis. 103, 64 N. W. 315; Raynor v. Bank, 122 Wash. 150, 210 P. 499, 25 A. L. R. 716.

[5] In discussing and applying the appropriate rules of law, counsel for the appellees have assumed that the Mitchell estate consisted of money, and that the estate's money was deposited in the Longview bank by Sparkman as administrator. Apparently the judgment of the trial court is based upon the same assumption. If those assumed facts are warranted by the evidence, a serious difficulty in the way of affirming that feature of the judgment would be removed. The following is a part of the agreed facts appearing in the record:

"When Jim Mitchell died, he had on deposit in the Republic National Bank of Dallas, Tex., the sum of $25,029.34 on interest; and on April 30, 1926, J. R. Sparkman, as administrator of Jim Mitchell estate, made a draft on the Republic National Bank of Dallas, Tex., in favor of the Commercial Guaranty State Bank of Longview, Tex., for $25,029.34, and that bank gave Sparkman credit as temporary administrator of Jim Mitchell estate for that amount. On May 3, 1926, Sparkman made another draft on- the Republic National Bank of Dallas, Tex., in favor of the Commercial Guaranty State Bank of Longview, Tex., for $500.68, and received credit for that amount in said Commercial Guaranty State Bank of Longview, Tex.; and the Republic National Bank of Dallas gave the Commercial Guaranty State Bank of Longview, Tex., credits for the two amounts. When the (Longview) bank closed its doors on the 29th day of September, 1926, the books showed the account of J. R. Sparkman as administrator of Jim Mitchell as follows:

Credits.

| | |
|---|---|
| April 30, 1926 | $25,029 34 |
| May 10, 1926 | 8,897 17 |
| May 3, 1926 | 500 68 |

$34,427 19

Debits.

| | |
|---|---|
| May 13 | $ 4,646 66 |
| May 15 | 14,000 00 |
| May 10 | 2,500 00 |
| May 10 | 1,000 00 |
| May 10 | 10,000 00 |
| July 25 | 258 06 |

$32,404 72

Balance, $2,022.47

"The parties agree that the sum of $258.06 drawn out of said bank on July 25, 1926, was to pay the funeral expenses of Jim Mitchell, deceased.

"The credit items shown in the account above of $8,897.17 was not money furnished by the estate of Jim Mitchell, and is improperly credited thereon."

It thus appears that the property which composed the estate was not money, but an interest-bearing obligation to pay money on demand. The situation would not have been materially different if the debt due from the Dallas bank had been evidenced by a promissory note instead of a certificate of deposit. These facts become important in determining whether or not the funds of the estate passed into the hands of the banking commissioner.

[6] Sparkman undertook to collect the debt due the estate by drawing drafts on the debtor bank, payable to the Longview bank, which he desired to make the depository of the funds. Those funds were either placed in the hands of the Longview bank for collection or they were sold to that bank. If they were placed there for collection, the proof showed that no money was ever collected from the debtor bank. Instead of demanding money in satisfaction of the drafts, the collecting agent, with the consent of Sparkman, accepted as payment corresponding credits in the agent's favor on the books of the Dallas bank. There is no evidence that any money was ever transmitted from the Dallas bank to the Longview bank after that transaction. The fair inference from the record before us is that the credits given by the Dallas bank were applied by it in satisfaction of debts due from the Longview bank. Hence it conclusively appears that the collecting agent never received from the debtor any money upon which a trust in favor of the estate could be impressed.

[7, 8] But the facts will support a conclusion that Sparkman sold the drafts to the ·Longview bank instead of placing them for collection. The precise nature of the transaction between Sparkman and the bank was a deposit of the drafts as so much money in consideration of corresponding credits in his favor as administrator entered upon the books of the bank. The question then is, Did the entry of those credits convey to the estate a title to an equal amount of money in the vaults of the bank? Or did it merely create the relation of debtor and creditor between the bank and the estate? If it only created the relation of debtor and creditor, then the sale of the drafts was merely an exchange of one obligation for another similar obligation, and the estate would still own no money in specie upon which a trust might be impressed. In considering the particular question here involved, what has been previously stated must be kept in mind; that is, that the right to impress a trust upon particular property depends on the right to assert ownership of the property, not the right to claim compensation for its loss. When trust funds are used by the trustee in the payment of his own debts, and thus placed beyond reach, or when for any other reason the rights of third parties intervene and defeat the right to reclamation by the beneficiary, the trust ceases, and the remedy of the cestui que trust is reduced to that of a common creditor. Cont. Nat. Bank v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85; Kansas St. Bank v. First St. Bank, 62 Kan. 788, 64 P. 634; Peters v. Bain, 133 U. S. 670, 10 S. Ct. 354, 33 L. Ed. 696; Macy v. Roedenbeck (C. C. A.) 227

F. 347, L. R. A. 1916C, 12; Shields v. Thomas, 71 Miss. 260, 14 So. 84, 42 Am. St. Rep. 458.

[9] If Sparkman had received money in exchange for the drafts, and had deposited that money in the bank, then it might be said that money belonging to the estate went into the vaults of the bank. The same result would follow if the bank, upon receipt of the drafts, had agreed to hold that amount of money in trust for the estate. But the record fails to show that any such agreement was made. On the contrary, the proof shows only ordinary credits on the books of the bank, apparently entered in the usual way upon receipt of general deposits. If the drafts which were deposited as money had belonged to Sparkman, and the credits had been entered in his name, there could be no hesitancy in saying that the relation of debtor and creditor was thereby created between him and the bank. Hewitt v. First Nat. Bank, 113 Tex. 100, 252 S. W. 161; Burton v. United States, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482. The fact that the draft deposited, and for which credits were entered, belonged to the estate, did not make the transaction with the bank legally different. A test of what the estate had in the bank after the deposit of the drafts as money may be found in ascertaining what the estate might have recovered upon a rescission of the contract of deposit. Let us suppose that, before the drafts passed into the hands of an innocent third party, or, in this instance, before they were paid by the Dallas bank, the fraud of the Longview bank had been discovered and a rescission of the contract of deposit sought. What could the owners of the estate have recovered? Clearly they could have recovered only the drafts, because these were the subject-matter of the contract which was rescinded. They would have been permitted in that event to reclaim only that which they had delivered to the perpetrator of the fraud. Certainly in such a proceeding the estate could not claim title to the equivalent of the drafts in money in the vaults of the bank, because that would involve an affirmance, and not a rescission, of the contract by which the drafts were procured. If, before the drafts had been disposed of, they only, and not an equal amount of money in the vaults of the bank, might have been recovered by the rescinding party, then upon what ground can it be said he can assert a different right after the drafts had been placed beyond his reach without leaving any tangible proceeds or substitute? The dissipation of the trust fund without leaving a trace, or substitute, does not enlarge the initial rights of the rescinding party. A draft is a form of commercial paper, a distinct commodity, which may be the subject-matter of title and ownership. When a com-

modity is deposited in a bank as money, and credit therefor taken on the books of the bank, the title to the paper, in the absence of fraud or agreements to the contrary, passes to the bank, and the relation of debtor and creditor arises between the bank and the depositor. Hewitt v. First Nat. Bank, 113 Tex. 100, 252 S. W. 161; Burton v. United States, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482; 3 R. C. L. p. 524.

[10] We therefore conclude from the evidence in this case that the only property belonging to the Mitchell estate which ever passed into the hands of the Longview bank through Sparkman as administrator consisted of the drafts drawn by him on the Dallas bank. Since those drafts were neither collected in money from the Dallas bank nor paid for in money by the Longview bank, no money belonging to the estate went into the Longview bank upon which a trust may now be impressed. City Bank v. Blackmore (C. C. A.) 75 F. 771; Empire State Surety Co. v. Carroll (C. C. A.) 194 F. 593; Burton v. United States, supra.

[11, 12] The claim of the appellees that they are entitled to priority because the assets of the insolvent bank were augmented by an appropriation of their property is also untenable. As before stated, the drafts were used by the insolvent bank in payment of its debts to the Dallas bank. Property used in that way cannot be treated as augmenting the assets of the insolvent bank so as to authorize reimbursement of the claimants in preference to the claims of general depositors. Cont. Nat. Bank v. Weems, supra. In the agreed statement hereinbefore quoted from it appears that all of the credits in favor of Sparkman on the books of the bank were off-set by checks drawn by him. Other testimony was introduced to show that the debits represented money used by Sparkman and his associates in replenishing the capital stock of the bank. The testimony of the auditor who examined the books of the bank after it ceased to do business shows that those credits were no more than book entries; that no money was taken out of the bank, nor was any additional money placed in the bank, as a result of those transactions. It conclusively appears that nothing was added to the assets of the bank which might be used in payment of its creditors.

[13, 14] Appellees contend, and the trial court so concluded, that, if they are not entitled to a preferred claim against the assets of the insolvent bank, they have a right to establish a claim against the state guaranty fund. That portion of the trial court is, we think, correct. While the estate could assert no right to any tangible property in the hands of the banking commissioner, it was a depositor within the meaning of the statute. The right of the appellees to es-

tablish a claim against the guaranty fund is resisted upon the ground that their deposit was interest bearing and was also secured. But the facts do not support that contention. While the probate court directed Sparkman to loan the money of the estate at interest, that had not been done, nor was the deposit secured by the bank or otherwise, except by the guaranty fund. The security relied on by appellants is the bond of the administrator. That bond was designed only to protect the beneficiaries of the estate against the default of the administrator, not the default of the bank.

That portion of the judgment of the trial court which gave the claims of the appellee priority over the claims of other depositors was, we think, an error. The remainder of the judgment we think was correct. The judgment will therefore be reformed accordingly, and, as reformed, affirmed.