No. 34,614

EARL L. WOODS, *Appellant*, v. W. J. DUVAL, REX E. LIPPITT, THEO M. GOFF, C. L. LIPPITT, H. B. LIPPITT, and FREDA P. LIPPITT, Administratrix of the Estate of Irvil Lippitt, Deceased, Intervenors, *Appellees*.

(99 P. 2d 804)

Opinion filed March 9, 1940.

*C. M. Williams, D. C. Martindell, W. D. P. Carey* and *Wesley E. Brown*, all of Hutchinson, for the appellant.

*Walter F. Jones, Claude E. Chalfant, Charles S. Fulton* and *J. Richards Hunter*, all of Hutchinson, for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This three-sided lawsuit was concerned with the proceeds of certain oil royalties withheld by a trustee and for recoupment of the proceeds of similar royalties theretofore disbursed by him.

The late Sam Lippitt, of Reno county, died intestate and unmarried on February 13, 1929. His only heirs were his sister, Mrs. Mary Woods, of Seattle, Wash., and his brother, Theodore Lippitt, of Sterling, Colo. Sam Lippitt left some personal property which included a note and mortgage, called the "Reynolds" mortgage, for $5,500, and some certificates evidencing fractional interests in potential oil royalties on two eighty-acre leaseholds in Rice county, neither of which had been developed when Sam Lippitt died. On

one of these eighty-acre leases, designated Rainey No. 1, the American National Bank of Hutchinson had undertaken to serve as trustee for the shareholders of whatever oil royalties might materialize. The bank had issued one such certificate to Sam Lippitt, dated June 11, 1926.

On the second eighty-acre lease, the defendant W. J. Duval had undertaken to serve in a similar capacity. Duval as trustee had issued six certificates to Sam Lippitt reciting that in each of them the latter was the owner of one-twenty-fourth of one-sixteenth of the royalties of the eighty acres described. Four of these certificates were dated January 12, 1926, one January 26, and one February 15, of the same year.

Sam Lippitt's estate was not probated. In April following his death Mrs. Mary Woods and Theodore Lippitt met and settled his estate informally. They agreed in writing that a certain bank in Hutchinson should receive payments of the interest and principal on the "Reynolds" mortgage and credit the same to the two heirs, share and share alike. Their written agreement also recited that—

> "It is also agreed that any money received from any of the oil and gas leases or royalties owned by the said Samuel L. Lippitt, deceased, may be paid to the Citizens Bank of Hutchinson, Kan., and divided, one-half to Theodore C. Lippitt and one-half to Mary M. Woods."

Sometime following this informal settlement of the Sam Lippitt estate, Theodore Lippitt accepted $2,000 in full settlement of his share of the "Reynolds" note and mortgage and sometime later Mrs. Mary Woods accepted $2,425 in full satisfaction of her half interest in that indebtedness.

The six certificates issued by Duval, trustee, to Sam Lippitt, which relate to the subject matter of this lawsuit appear to have remained in the possession of a Mr. Williams, attorney for Sam Lippitt in his lifetime, until January 12, 1935, at which time he delivered them to Mrs. Mary Woods.

In November, 1930, oil was discovered in paying quantities on the eighty-acre leasehold in which Duval was serving as trustee. On advice or instructions from Mr. Williams early in 1931, Duval, the trustee, made the first oil-royalty checks to Mrs. Mary Woods and delivered them to Mr. Williams. In June of the same year Mr. Williams advised Duval that future remittances should be mailed direct to Mrs. Mary Woods in Seattle, and Duval did so.

On February 11, 1931, some three months or less after the oil

discovery, and about the time the first royalty checks were being distributed, Theodore Lippitt died in Colorado, testate, leaving several sons and a daughter. Duval knew nothing of those heirs, and in the belief that no one but Mrs. Mary Woods, of Seattle, had any interest in the royalty proceeds pertinent to the six certificates he regularly remitted them to her for several years. The Theodore Lippitt heirs in Colorado knew nothing of the Duval trusteeship, nor of the existence of the six certificates, nor that they had any interest in them, nor that the leasehold to which they pertained had become a producing property.

Sometime in the year 1935, date not shown, oil was discovered in paying quantities on the other eighty-acre leasehold, of which the American National Bank was trustee. A demand was made on behalf of Mrs. Mary Woods that the proceeds of the oil-royalty interest shown by the bank's certificate issued to Sam Lippitt, dated June 11, 1926, be paid to her. The bank hesitated to comply, and on August 10, 1935, an action in the name of Mary Woods as plaintiff was commenced in the district court of Reno county against the bank, alleging she was the owner of the certificate and entitled to the oil royalties accruing thereto. She also alleged that Sam Lippitt had died intestate in 1929, that a settlement of his estate had been effected between herself and Theodore Lippitt, who were his only heirs; that Theodore Lippitt had died intestate in Colorado, single, and that she was his sole heir. While that action was pending, Mrs. Mary Woods died at her home in Seattle on August 29, 1935. About the same time the trust officer of the American National Bank learned that the late Theodore Lippitt had been a married man and had left surviving him in Colorado certain heirs at law. Following the death of Mrs. Woods the action was revived in the name of Earl Woods; the heirs of Theodore Lippitt intervened; and on October 19, 1935, judgment was rendered directing the American National to cancel its certificate of June 11, 1926, issued to Sam Lippitt, and in lieu thereof to issue certificates to the intervening heirs and to Earl Woods in accordance with their proportionate interests in the royalty in question.

Following the death of Mrs. Mary Woods on August 29, 1935, Duval sent to Earl Woods four monthly remittances totalling $372, for the proportionate amount of the collected royalties on the six certificates issued to Sam Lippitt by Duval, trustee. Early in 1936, Duval learned of the existence of heirs of Theodore Lippitt,

and thereafter he withheld the royalties which were accruing to the owners of the interests evidenced by the six certificates involved in this action.

In March, 1936, C. L. Lippitt, one of the Colorado heirs of Theodore Lippitt, learned the facts concerning the Duval trusteeship and of the interest of the Theodore Lippitt heirs therein; and after some ineffectual efforts to get the snarled matters put to rights, on June 22, 1936, an action was begun in the city court of Hutchinson by the Theodore Lippitt heirs against Earl Woods. In their bill of particulars they alleged that they were jointly the owners of an undivided half interest in the royalty rights evidenced by the six certificates executed to Sam Lippitt by Duval as trustee, and that the defendant Earl Woods, owner of a similar undivided half interest therein, had collected the entire amount apportioned as royalties thereto for the months of August, September, October and November, 1935, to wit, $372; whereas they were entitled to the half of that amount, $186, for which sum they prayed judgment. Mr. Williams entered appearance for the defendant Earl Woods and confessed judgment as prayed for. Judgment was rendered accordingly on February 6, 1937.

Coming now to the immediate controversy we have to consider, on September 9, 1937, Earl Woods brought this action against Duval, asserting his ownership of the six certificates, and that Duval had withheld the proceeds of the pertinent royalties collected since January 1, 1936, amounting to $1,038, which sum was due plaintiff, and praying judgment thereof.

Duval answered with a general denial and pleaded the facts narrated above at length, his want of knowledge that Theodore Lippitt had any heirs except his sister, Mrs. Mary Woods, that since production of oil had begun on the leasehold of present concern, about January 1, 1931, he had collected and disbursed to Mrs. Mary Woods the monthly royalties pertinent to the six certificates in the aggregate sum of $7,479.80. Duval further admitted that he had overpaid Mrs. Woods to the extent of one-half that amount, to wit, $3,739.90, and alleged his willingness to pay the further proceeds of the royalties represented by the six Sam Lippitt certificates to whomsoever the court would direct.

The heirs of Theodore Lippitt were given leave to intervene, and on May 27, 1938, they filed their intervening petition, alleging their ownership of an undivided half interest in the six certificates and

the royalty proceeds inuring thereto, and praying judgment against W. J. Duval for $3,739.90, and that they be given a lien upon all the royalties accruing to the six certificates until they should receive as much as the trustee had theretofore paid to Mrs. Mary Woods.

Plaintiff filed an answer to the intervenors' petition denying their ownership of any part of the six certificates or any interest in the royalties accrued or accruing thereto. He also pleaded adverse possession of the certificates in his mother, Mrs. Mary Woods, in her lifetime and his own possession of them since her death, and that any right they or their father, Theodore Lippitt, had in said certificate had accrued prior to his death on February 2, 1931, and was barred by various provisions of the statute of limitations.

Plaintiff further pleaded the death of Mrs. Mary Woods on August 29, 1935, and that her estate had been duly inventoried and appraised in the probate court, thus:

| | |
|---|---|
| Real estate ........................................................ | nil |
| Personal estate consisting of a half interest in oil stocks and royalty certificates inherited from her brother, Sam Lippitt, which had never paid a dividend........................................ | $31.00 |
| Total appraised value of estate.................................. | $31.00 |

Filed October 29, 1935.

Plaintiff further alleged that at no time had any claim been made against her estate for any of the oil-royalty funds paid to Mrs. Mary Woods by W. J. Duval, and that the statutes of Washington barred all claims against an estate unless filed within six months. Plaintiff's answer to the intervening petition prayed for an adjudication of his sole ownership of the six certificates.

Duval filed a demurrer to the intervening petition, and later filed an answer denying generally its allegations, pleading estoppel on the part of the intervenors because they had never presented to him any claim of ownership or interest in the certificates; that until December 14, 1935, he had no knowledge or notice of the existence of defendants or of their claims of interest in the royalties pertaining to the six certificates; that since he had received such notice he had collected and was holding subject to the order of the court about $1,500 in royalties pertinent to the six certificates. Duval further pleaded that the statute of limitations barred the intervenors' claims or the greater part thereof. He concluded with a prayer for judgment as to how and to whom he should pay the moneys in his hands

and any future moneys he might collect as royalties involved in the action.

In an amended petition filed June 25, 1938, the intervenors amplified their first petition, narrated the facts of their father's agreement with Mrs. Mary Woods for the division of the "Reynolds" mortgage between them, the facts of their father Theodore's death, the probate of his will and the winding up of his estate on March 4, 1935; that they did not know whether the estate of Mrs. Mary Woods in Washington had been settled or not, and that the six certificates in dispute had never been inventoried as a part of her estate. They also alleged the facts and results of the litigation between Mrs. Mary Woods (Earl Woods, substituted) against the American National Bank, that they had been permitted to intervene and to plead therein and the judgment in that action on October 19, 1935, which decreed that the intervenors were the owners of an undivided half interest in the royalties in "Rainey No. 1," as evidenced by the certificate of June 11, 1926, issued by the bank to Sam Lippitt.

Attached to this amended petition were pertinent exhibits—a copy of the agreement between Theodore Lippitt and Mrs. Mary Woods informally dividing the estate of Sam Lippitt between themselves, a copy of the will of Theodore Lippitt probated in Colorado, a copy of the administrator's inventory of the estate of Mrs. Mary Woods filed in the probate court in King county, Washington, showing nothing except a number of miscellaneous oil stocks and certificates of potential oil and gas royalties appraised at the total sum of $31. The certificates involved in this lawsuit were not listed in the inventory, nor was the one involved in the action against the American National Bank. Also attached to the intervenors' amended petition was a copy of the judgment to which we have just referred.

Plaintiff moved to strike this amended intervening petition from the files for various reasons, which will be noticed later if this appeal should turn on the propriety of the court's ruling on the points urged against it.

On June 30, 1938, Duval filed a demurrer to the intervenors' amended petition, which invoked the statute of limitations—except as to the royalty moneys he still held and which he was ready to disburse as the court should direct. This demurrer seems to have been overruled. On July 19, 1939, Duval answered with a general

denial and pleaded a counterclaim against the plaintiff based on the overpayments of royalties he had been misled into paying to Mrs. Mary Woods in her lifetime on the advice of Mr. Williams, her attorney. He further alleged that such overpayments aggregated $3,739.90, which he should have paid to the intervenors as owners of the undivided half interest in the six certificates in controversy. His counterclaim frankly continued thus:

"That this defendant having wrongfully overpaid the said Mary M. Woods does not have trustee funds, belonging to said interest, with which to pay the claims of said intervenors, and verily believes, and therefore alleges, that he is entitled to any equitable lien upon the interest in said royalty owned by the estate of Samuel L. Lippitt, deceased, to protect your intervenors against loss by reason of wrongful acts of the plaintiff and his predecessor in interest."

This counterclaim concluded with a prayer that an equitable lien be created on plaintiff's half interest in the royalties collected and withheld by Duval and upon whatever further royalties he might collect, which lien should "protect this defendant, as trustee, against the claim of your intervenors," and for other equitable relief.

Plaintiff demurred to this last answer and counterclaim of Duval; and later answered it, amplifying his earlier allegations of fact and raising questions of law included in earlier pleadings.

The cause was tried by the court without a jury. The evidence, while lengthy and unusually complicated, did not develop any vital question of disputed fact. At its conclusion the trial court gave judgment that the intervenors were the owners of an undivided one-half interest, and that the plaintiff was likewise the owner of an undivided one-half interest, in the six oil-royalty certificates executed by W. J. Duval, as true, to Sam Lippitt; and that—

"It is further ordered, adjudged and decreed by the court that a trust be and it is hereby impressed upon the said undivided one-half interest of the plaintiff Earl L. Woods in and to said six royalty certificates in favor of the intervenors, . . . in the sum of $3,739.90 with interest at six percent from and after May 27, 1938, and the defendant W. J. Duval, trustee, is hereby ordered and directed to pay to the aforesaid intervenors all of the income received from the interest owned by Earl L. Woods, until the full amount of said judgment of $3,739.90 plus interest is paid, and that no further sums shall be paid to the plaintiff Earl L. Woods by W. J. Duval, trustee, until the said intervenors have received out of the undivided one-half interest owned by Earl L. Woods the total amount of $3,739.90 plus six percent interest on said amount from May 27, 1938, until full payment is received by intervenors."

Plaintiff appeals, contending first that the two- and five-year clauses of the statute of limitations (G. S. 1935, 60-306) barred the

intervenors' cause of action filed on May 27, 1938, which was more than seven years after Mrs. Mary Woods began to receive all the oil-royalty proceeds pertinent to the six certificates pursuant to her claim of exclusive ownership and possession thereof.

This contention might be difficult to overcome, but for the fact that the question of intervenors' ownership of an undivided half interest in the certificates and of the oil royalties pertaining thereto were the very matters in issue and adjudicated *pro confesso* in the action in the city court of Hutchinson on February 6, 1937, wherein these intervenors sued Earl Woods to recover half the total amount of the remittances he had collected following his mother's death from Duval, the trustee. In that situation plaintiff was estopped in this present action to reassert his exclusive and sole ownership of the six certificates in controversy and of the royalties pertaining thereto. (*Schermerhorn v. Mahaffie,* 34 Kan. 108, 8 Pac. 199; *Anderson v. Stockwell,* 130 Kan. 103, 285 Pac. 526, syl. ¶ 1; *Underwood v. Greenlees,* 131 Kan. 308, 311, 312, 291 Pac. 777.)

Mayhap the judgment in the district court in the action between Mrs. Mary Woods (Earl Woods, substituted) and the American National Bank, wherein plaintiff's claim to the entire and exclusive ownership and incidents of the trust certificate issued by that bank to Sam Lippitt was adversely adjudicated, and the heirs of Theodore Lippitt, intervenors herein, were decreed to own an undivided one-half interest therein did not raise an additional barrier of estoppel against plaintiff in this action, but we need not say that that lawsuit and its incidents and results had no probative value on the question at issue in this lawsuit—whether Mrs. Mary Woods' claim of exclusive ownership of all the Sam Lippitt certificates, the one issued by the bank as trustee, as well as those issued by Duval as trustee, had been exercised without dispute for a sufficient length of time to bar the intervenors from asserting a claim to them or either of them. However, since the adjudication in the city court case had every element of estoppel, by record and by judgment, we think so much of the present judgment now under review as concerns the intervenors' ownership of an undivided half interest in the six certificates issued by Duval, trustee, is unassailable.

But we come to a matter of greater gravity, the trial court's decree impressing a trust upon Earl Woods' undivided half interest in the six certificates and their pertinent royalties which have accrued and are now held by Duval, trustee, and which may hereafter accrue

thereto, for the benefit of the intervenors until they shall receive an amount equal to one-half the aggregate sum heretofore paid by Duval, trustee, to Mrs. Mary Woods in her lifetime, to wit, $3,739.90.

Various objections to this phase of the judgment are urged and some intrude uninvited. In olden time, not only were iniquities of the fathers visited upon their children to the third and fourth generation, but their debts also. (2 Kings 4:1; Matt. 18:23-25.) Not so in our time. A man's debts and liabilities are a proper charge upon his estate if presented in time. Ordinarily whatever is distributed to his heirs after the administration of his estate is duly settled and properly closed passes to them without any burdens or impressments of any sort. Exceptions there may be, as in cases of property covered by mortgage, unpaid tax liens, labor liens and the like. So, too, if the money or property passing to the heirs was acquired through fraud, a trust may be equitably impressed on it; but before that can be decreed the fraud must be proved, the equitable redress must be timely invoked, and the fund or property must be clearly traced into the hands of some person who has received it, and it must still be in existence. Whether all these prerequisites to the impressment of a trust are wanting here we need not say. Certain it is that the most important of them is wanting. There was no evidence, indeed it is not so contended, that a single dollar of oil-royalty moneys paid monthly over a term of years by Duval, trustee, to Mary Woods existed in her estate when she died, or when it was inventoried, or that after its administration was wound up any residue thereof devolved on this plaintiff.

In *Myers v. Board of Education*, 51 Kan. 87, 32 Pac. 658, the action was to impress a trust on the assets of an insolvent banker for moneys of a board of education which he had misappropriated. This court quoted Judge Story's old rule:

> "'The right to follow a trust fund ceases when the means of ascertainment fail, which, of course, is the case when the subject matter is turned into money and mixed and confounded in a general mass of property of the same description.' (Story, Eq. Jur., § 259.)" (p. 98.)

But, continuing the discussion, we said:

> "The modern doctrine of equity, and the one more in consonance with justice, is . . . that, when the funds are traced into the assets of the unfaithful trustee, or one who has knowledge of the character of the funds, they become a charge upon the entire assets with which they are mingled." (p. 99.)

The ordinary rule of equity which has often been declared is

where money has been converted, misappropriated or erroneously disbursed, but which can still be traced, or has been invested in property which can be identified, equity will follow it and impress a trust on it where no injustice to third parties will result. Thus in *Bank v. Bank,* 62 Kan. 788, 795, 64 Pac. 634, it was said:

"Equity follows a trust fund through any number of changes and allows an owner to reclaim it when and wherever it can be identified. It matters not how much it may have been changed, either in form or character, it still belongs to the owner, and if it, or its fruits or substitute, can be found among the assets of the trustee, the amount of the fund may be taken out of such assets, providing no superior rights of innocent third parties have intervened."

To the same effect was *Clingman v. Hill,* 104 Kan. 145, 178 Pac. 243; *Id.,* 113 Kan. 632, 215 Pac. 1013.

On the other hand, where the estate of the recipient of trust moneys has not been augmented thereby, no trust can be impressed on the assets of such estate. Thus in *Secrest v. Ladd, Receiver,* 112 Kan. 23, 209 Pac. 824, it was said:

"The right to follow and retake proceeds of trust property ceases only when assets into which the fund has come have been expended so that no part of them can be traced to existing assets." (p. 25.)

See, also, *Eklund v. Fidelity State Bank,* 134 Kan. 342, 348-349, 5 P. 2d 791 and citations; "Following Misappropriated Property" in 3 Kan. Bar Journal (May, 1935), 302-305; Restitution, Restatement, 640, 866, § 160 and § 215.

Since no part of the $3,739.90 which Duval, trustee, paid to Mrs. Mary Woods could be traced into the hands of this plaintiff, the rule that equity will impress a trust on money wrongfully received as far as the money can be traced has no application. Plaintiff received none of that money, except the four monthly remittances following his mother's death and for which he confessed judgment in the city court in 1935. The six certificates in which he owns an undivided half interest (as adjudicated in the city court case and in this case) are not the product of the excess payments of $3,739.90 his mother received as oil royalties from Duval, trustee, in her lifetime. Consequently, so much of the trial court's judgment as imposed a trust on the present accrued royalties now in Duval's hands and on those which may yet accrue, and which pertain to plaintiff's undivided half interest in the six certificates in controversy, cannot stand.

Other objections to this phase of the judgment need no discussion.

but some of the justices would add that the intervenors' judgment against plaintiff in the city court barred any further claim against him directly or indirectly on account of overpayments of oil royalties prior to the institution of that action—under the familiar rule of law which will not tolerate the splitting of causes of action. (*First National Bank v. Schruben,* 125 Kan. 417, 265 Pac. 53 and citations.) We also deem it unnecessary to discuss the question whether the intervenors' claim did not fail altogether because it was not filed against Mrs. Mary Woods' estate. (Time allowed for filing in Washington, six months; within one year under our law prior to July 1, 1939.) See 2 Bartlett's Kansas Probate Code, 403; *Newton v. Insurance Co.,* 95 Kan. 427, 148 Pac. 619, syl. ¶ 2. We do not overlook the fact that no judgment was rendered against the trustee for the wrongful disbursement of the intervenors' share of the oil royalties, but that point is of no significance, since there is no cross-appeal on account of it.

On mature reflection we think that justice will be best subserved by remanding this cause to the district court with instructions to set aside that part of the judgment which would impress a trust on plaintiff's share of the royalties now in the hands of the trustee and on his share of future royalties; also, that for the benefit of all concerned the trustee should be directed to pay the costs of this action out of the royalty funds now in his hands pertaining to the six certificates in controversy, and to divide the balance thereof now in his hands, one-half to plaintiff and one-half to the intervenors, and that whatever future royalties may yet be collected by the trustee be disbursed in the same proportions. It is so ordered.

ALLEN, J. (dissenting): Sam Lippitt died on February 3, 1929, intestate, unmarried, leaving as his sole heirs Mary Woods, a sister, and Theodore Lippitt, a brother. At the time of his death Sam Lippitt was the owner of certain mineral interests represented by trustee's certificates. This property passed to the brother and sister in equal shares.

Theodore Lippitt lived in Colorado. He died, testate, February 11, 1931. His children, legatees under his will, are intervenors in this action.

Duvall, trustee of the mineral property, was unaware of the fact that Theodore had died leaving heirs and legatees. By mistake he paid large sums—accruals from the mineral property owned by Sam

Lippitt at the time of his death—to the sister, Mary Woods. She accepted the payments so made and appropriated the same to her own use. Mary Woods died August 29, 1935. The plaintiff, Earl Woods, is her son, and as sole beneficiary under her will now claims the mineral property represented by the trustee's certificates. Under the judgment of this court he is found to be the true owner of the property.

I suppose it will not be disputed that Mary Woods, if alive, would be compelled to make restitution to her brother's children, whose property she appropriated. Does her son, who claims title as beneficiary under her will, have a better title? If he occupied the position of a bona fide purchaser of the property for value, and without notice of the rights of the children and legatees of Theodore Lippitt (intervenors here) the answer would be yes. But does he occupy that favored position? It taxes credulity to suppose he did not know of their rights and claims. But admit he had no notice of their claims—getting the property under the will, what thing of value did he part with?

In 2 Pomeroy's Equity Jurisprudence, § 747, the author states:

"What constitutes a valuable consideration within the meaning of the doctrine which gives protection to a bona fide purchaser? No person who has acquired title as a mere volunteer, whether by gift, devise, inheritance, post-nuptial settlement on wife or child, or otherwise, can thereby be a bona fide purchaser. Valuable consideration means, and necessarily requires under every form and kind of purchase, something of actual value, capable in estimation of the law, of pecuniary measurement—parting with money or money's worth, or an actual change of the purchaser's legal position for the worse. . . ."

It follows that the plaintiff who stands before the court as a mere windfall volunteer stands in the shoes of his transferor. He paid nothing of value and therefore does not have a better title.

Although the trustee paid the money to Mary Woods in good faith, it was negligently paid and was a breach of trust. (Restatement, Trusts, § 201 and *Comment.*)

Section 289, and *Comment* from the same authority, read:

"If the trustee in breach of trust transfers trust property and no value is given for the transfer, the transferee does not hold the property free of the trust, although he had no notice of the trust.

"*Comment: a.* The interest of the beneficiary in the trust property is not cut off by a transfer by the trustee in breach of trust to a third person if no value is given for the transfer, although the transferee had no notice that the transfer was in breach of trust; and the beneficiary can in equity compel the third person to restore the property to the trust. . . ."

The plaintiff claims title by adverse possession. Duval was trustee of an express trust. As he had not repudiated his trust obligations, the statute of limitations has not barred the claims of the intervenors as against him. As the plaintiff Earl Woods and the intervenors are co-tenants in the mineral interests represented by the certificates, the statute would not run against the intervenors in favor of plaintiff.

The dispute before us is between various claimants to a trust estate. It is a proceeding in equity, and unless the intervenors have been guilty of laches, they are not barred.

In *Osincup v. Henthorn,* 89 Kan. 58, 130 Pac. 652, the doctrine as to laches is stated:

> "The general rule is that equity will not interpose to relieve from a mistake where there is inexcusable delay and negligence in asserting a right or where the granting of the relief would operate inequitably, but laches is an equitable defense and will not bar a recovery from mere lapse of time nor where there is a reasonable excuse for nonaction of a party in making inquiry as to his rights or in asserting them." (Syl. ¶ 2.)

See, also, *Detweiler v. Swartley,* 74 Kan. 855, 86 Pac. 141; *Basye v. Refining Co.,* 79 Kan. 755, 101 Pac. 658; *Harris v. Defenbaugh,* 82 Kan. 765, 109 Pac. 681.

The general rule is that restitution will be denied because of laches only where a party, with full opportunity to pursue a remedy, delays without adequate reason until, if restitution were granted the other party will suffer a loss which would not have occurred had the action been brought with a fair degree of promptness. It is not shown that the plaintiff Earl Woods has changed his position or would suffer any loss by reason of the delay in bringing the action.

In Restatement, Trusts, § 254, and *Comment a* thereunder, it is stated:

> "If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment.
>
> *"Comment: a. Charge on beneficiary's interest.* If the trustee by mistake or otherwise makes a payment out of the trust estate to one beneficiary which should have been made to another, the beneficiary so paid is personally liable for the repayment of the amount so paid, and his beneficial interest is subject to a charge therefor."

The trial court decreed that the interest of Earl Woods should be impressed with a lien or charge until restitution should be made. This appears to be a just result.